UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X

KEVIN CARROLL ANDERSON,

                                        Plaintiff,

                   v.

ARTHUR B. GREENE, *et al.*,

                                 Defendants.

---------------------------------------------------X

14 Civ. 10249 (KPF)

OPINION AND ORDER

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: August 10, 2016

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Kevin Carroll Anderson brought suit against accountant Arthur B. Greene ("Greene"), and accounting firms Arthur B. Greene & Company, P.C. ("ABG Co.," and with Greene, the "Greene Defendants"), and Marks, Paneth & Shron LLP ("MPS," and collectively with the Greene Defendants, "Defendants"), alleging breach of fiduciary duty based on a theory of constructive fraud and legal malpractice. Defendants now move to dismiss Plaintiff's Third Amended Complaint on the grounds that (i) the statute of limitations for all claims expired prior to the filing of Plaintiff's lawsuit, and (ii) Plaintiff has not stated a claim upon which relief can be granted. The Court has exercised its discretion to convert the motions into motions for summary judgment insofar as they relate to Defendants' limitations-based arguments. And, for the reasons discussed below, Defendants' motions are granted in part and denied in part; all of Plaintiff's claims are dismissed, with the exception of his claims against

Greene and MPS for breach of fiduciary duty relating to his 2009 and 2010 tax returns.

## BACKGROUND[1]

### A.     Factual Background

#### 1.      The Relationships Between and Among the Parties

Plaintiff alleges that Greene served, from 1990 until at least 2012, as his "lawyer, tax advisor, CPA, bookkeeper, financial planner, investment advisor, and overall business manager."  (TAC ¶ 8).  At the beginning of the relationship, Greene worked at ABG Co.; in 2009, Plaintiff states, ABG Co. merged with MPS, and Greene thereafter provided services from MPS.  (*Id.* at ¶ 5).  Initially, Greene worked only as Plaintiff's accountant; after about five

---

[1]     The majority of the facts contained in this Opinion are drawn from Plaintiff's Third Amended Complaint ("TAC," Dkt. #58).  They are accepted as true for purposes of these motions.  *See Faber* v. *Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).  Additional factual material relevant to Defendants' statute of limitations-based defenses is drawn from the exhibits attached to the Declaration of Sari E. Kolatch in support of the Greene Defendants' motion to dismiss ("Kolatch Decl.," Dkt. #41); the Affidavit of Mark Levenfus submitted in conjunction with Defendant MPS's motion to dismiss ("Levenfus Aff.," Dkt. #47); the exhibits attached by Plaintiff to his opposition to Defendants' motion to dismiss (Dkt. #63-64); and the exhibits attached to the parties' supplemental briefing after the Court converted the motions, in part, into motions for summary judgment (Dkt. #86-87, 90-92).

For convenience, the Greene Defendants' motion to dismiss Plaintiff's Second Amended Complaint will be referred to as "Greene Br." (Dkt. #39-41), Plaintiff's response in opposition as "Pl. Greene Opp." (Dkt. #64), and the Greene Defendants' reply addressing Plaintiff's Third Amended Complaint as "Greene Reply" (Dkt. #69-70); Defendant MPS's motion to dismiss Plaintiff's Second Amended Complaint will be referred to as "MPS Br." (Dkt. #44-47), Plaintiff's response in opposition as "Pl. MPS Opp." (Dkt. #63), and MPS's reply addressing Plaintiff's Third Amended Complaint as "MPS Reply" (Dkt. #67).  Plaintiff's sur-reply in response to both Defendants' motions to dismiss the Third Amended Complaint will be referred to as "Pl. Reply" (Dkt. #76).

Further, Plaintiff's additional briefing with regard to Defendants' motions for summary judgment will be referred to as "Pl. Supp. Br." (Dkt. #86).  The Greene Defendants' additional briefing will be referred to as "Greene Supp. Br." (Dkt. #91), and Defendant MPS's additional briefing will be referred to as "MPS Supp. Br." (Dkt. #90).

years, in 1990, Greene approached Plaintiff with an offer to provide "full business management services." (*Id.* at ¶ 22). These services were detailed in a prospectus dated November 7, 1990, followed by a meeting on December 4, 1990, which Plaintiff transcribed and has termed a "verbal contract." (*Id.* at ¶¶ 22-23; TAC, Ex. 1A, 1B).[2]

Greene "represented to [Plaintiff] that he was a financial expert" who could manage and invest Plaintiff's money more aptly than Plaintiff, and thus, he would "maintain[] full custodial control and signature authority" on all of Plaintiff's accounts. (TAC ¶¶ 9-10). As Plaintiff enumerates, the written prospectus indicates that Greene would "be responsible for":

> planning the financial future of [Plaintiff], contract negotiations, receipt of all income, deposit[ing] all earnings, drawing checks to pay bills, maintaining records, all tax returns, wills, trusts, estate planning, insurance, supervision of investment program, determination of asset purchases, and all financial planning for an annual fee of 5% of yearly gross professional earnings.

(*Id.* at ¶ 24). Plaintiff claims that Greene "received all monies and mail" for him, and "recommended" that he (Greene) have durable and individual power of attorney. (*Id.* at ¶ 10). Further, Greene created a corporation for Plaintiff, Joe Coyote Inc. ("JCI"), and served as Secretary and Treasurer of that corporation. (*Id.* at ¶ 9).

---

[2]    The "verbal contract" comprises a transcript of a meeting between Plaintiff and Greene that was "recorded and subsequently transcribed" with Greene's consent; Plaintiff attaches the transcript as an exhibit to his Third Amended Complaint. (TAC ¶ 23, Ex. 1B).

3

Plaintiff asserts that, by virtue of Greene's role as his accountant, a fiduciary relationship existed; Greene also "rendered personal financial, investment, and tax advice," and managed Plaintiff's "assets and business," including his defined contribution pension fund. (TAC ¶ 12). Plaintiff claims Greene had "complete and total control" of Plaintiff's finances, along with "legal control" through his role as the "Secretary Treasurer of JCI and the trustee of the JCI pension/investment account"; Greene's "superior knowledge" and "position of trust and confidence" placed him in a fiduciary role." (*Id.* at ¶¶ 11, 13).

### 2. Plaintiff's 2010 Discovery of Financial Problems

Plaintiff alleges that in late 2010, he went to a bank to cash a certificate of deposit ("CD"), but discovered that it had been garnished due to a federal tax lien, "because his taxes had not been filed for 6-8 years." (TAC ¶ 15). Plaintiff claims not to have been aware of any tax liens, as Greene received all of Plaintiff's mail and failed to inform him of any issues. (*Id.*). Plaintiff requested to meet with Greene and his partner, Richard Guttenberg, who were then employees at MPS, but they became "uncooperative and evasive" and would not agree to meet. (*Id.* at ¶¶ 15-16).[3] According to Plaintiff, he "began to learn [that this failure to file Plaintiff's taxes over a period of years] was only a fraction of the financial wrong doings." (*Id.* at ¶ 19).

---

[3]     While the TAC contains certain allegations concerning Guttenberg, the Court notes that he is not named as a defendant in this action.

### 3.     The 2011 Termination of Plaintiff's Business Relationship with Defendants

Plaintiff states that, at some point, he received an email indicating that MPS would drop him as a client effective December 31, 2011.  (TAC ¶ 25).  As he alleges, this termination occurred "without completion of paid for work including six (6) years of [ ] personal taxes and 10-12 years of JCI returns and required reports."  (*Id.*).  Further, Greene "resigned as trustee" of the JCI Pension Plan on May 18, 2012.  (*Id.* at ¶ 26).

### 4.     Plaintiff's Breach of Fiduciary Duty Allegations Against Defendants

Plaintiff asserts that Defendants breached their fiduciary duty of care through constructive fraud by "showing an outrageous, reckless, abusive, and egregious disregard," specifically by:

(i)     "routinely mismanaging" Plaintiff's finances;

(ii)    failing to prepare, send to Plaintiff, or file Plaintiff's tax returns on time or at all;

(iii)   "failing to invest funds carefully, prudently, and promptly";

(iv)    "not changing or recommending a new investment strategy where warranted by a change in circumstances";

(v)     not retaining Plaintiff's personal documents, absent Plaintiff's permission to destroy or discard them;

(vi)    dismissing Plaintiff's "many requests"; and

(vii)   "diverting and draining [Plaintiff's] investments and pension account leaving him essentially homeless and almost completely bankrupt."

(TAC ¶ 18).  Plaintiff claims that these breaches harmed both his personal life and his professional standing, and, "most painfully," rendered him

5

financially unable to provide for his mother before she died.  (*Id.*).  Plaintiff also states that the conduct at issue "[was] either done by Mr. Greene, or he directed someone within ABG&Co or MPS to do so."  (*Id.* at ¶ 20).

Plaintiff does not address the violations listed in the preceding paragraph claim-by-claim; rather, he presents a laundry list of factual allegations that the Court will address in the order they are presented, omitting those allegations that amount to mere legal conclusions.

### a.    Failure to File Taxes

First, Plaintiff alleges that Greene failed to file or send Plaintiff's personal taxes in 1994 and from 2004 to 2011, resulting in liens, levies, garnishment of wages and bank accounts, and a tax bill of approximately $100,000.  (TAC ¶¶ 28-29).  Additionally, Plaintiff claims that Greene failed to file corporate taxes and required forms for JCI for a period of 10 to 12 years.  (*Id.* at ¶ 29). Plaintiff states that, in the fall of 2010, Guttenberg informed him that Greene was transferring Plaintiff's money into Greene's personal account to avoid Government seizure, but Guttenberg did not inform Plaintiff of any liens or levies at that time.  (*Id.* at ¶ 30).[4]

Plaintiff states that, after hiring an independent attorney in July 2011, that attorney was informed by Greene that Plaintiff "had slipped through the cracks," which Plaintiff interprets to mean "the returns had never been completed or filed."  (TAC ¶ 33).  Greene later stated to Plaintiff that the tax

---

[4]     Plaintiff does not address the disconnect in his pleadings between his conceded awareness that his money was being transferred to avoid Government seizure and his professed ignorance of any liens and levies that might have precipitated those transfers.

forms had indeed been prepared and mailed to Plaintiff, but Plaintiff had not filed them. (*Id.*). Plaintiff contends that Greene received "numerous warnings and notices spanning several years," alerting him to Plaintiff's tax delinquencies. (*Id.*). And while acknowledging Greene's claim that he never signed tax forms, Plaintiff states that Greene had power of attorney and had previously signed IRS extension forms and JCI corporate returns. (*Id.*).

Further, Plaintiff alleges that in June 2011, Guttenberg dated a 2005 tax return with the date "10/10/06," even though the actual date was June 21, 2011. (TAC ¶ 34). Guttenberg assured Plaintiff that this was acceptable, but as Plaintiff asserts, this "created a situation that made it appear that [Plaintiff and his then-wife] were simply refiling their returns," when it was instead an attempt to cover Greene's prior failures to file. (*Id.*).

Next, Plaintiff asserts that Greene purports to have all previous tax forms and pertinent records saved to his computer; however, following Plaintiff's request for these documents in November 2010, it took six to nine months for Greene to send the tax forms to Plaintiff. (TAC ¶ 35). Further, in the course of preparing delinquent tax forms for 2009 and 2010, Plaintiff sought records from Greene and MPS in order to answer certain questions, but they "denied access to the records requested." (*Id.* at ¶ 36).

Separately, Plaintiff alleges that while he was attempting to resolve these tax issues, other MPS employees — also not named as defendants — endeavored to transfer Plaintiff's Chase Bank account to a retail branch without Plaintiff's consent. (TAC ¶ 38). While Plaintiff expressed opposition,

7

the address on this account was ultimately changed.  (*Id.*).  Finally, Plaintiff

claims "a discrepancy between Social Security reported earnings ($3,500,000)

as reported by Mr. Greene and earnings on [Plaintiff's] union statements

($7,100,000 including foreign earnings)."  (*Id.* at ¶ 39).

### b.    Failure to Keep or Transmit Complete Records

As but another proffer of misconduct, Plaintiff alleges that Greene

breached his fiduciary duty "by not disclosing all relevant facts relating to

matters regarding [Plaintiff's] finances."  (TAC ¶ 41).  As he states, rather than

providing all bank, financial, and investment statements to Plaintiff, Greene

provided "monthly summary statements," not including "separate itemized

invoices for services rendered for [Plaintiff] or JCI"; Plaintiff did not separately

receive backup documentation (such as bank statements) at his home address.

(*Id.* at ¶¶ 42, 45).  Plaintiff claims that the summary statements "contained

unexplained large transactions and failed to provide [a] full, detailed, and

accurate account of all monies."  (*Id.* at ¶ 43).  Plaintiff further states that these

statements did not conform to Generally Accepted Accounting Principles

("GAAP").  (*Id.* at ¶ 52).

More specifically, Plaintiff claims that (i) he received a Smith Barney

financial statement in the late 1980s listing an offshore account that did not

appear on his monthly summary statement;[5] (ii) even after more than 30

---

[5]    Plaintiff does not attempt to reconcile his allegation that he received only summary
       statements with his receipt of at least one Smith Barney statement.  Additionally,
       inasmuch as Plaintiff alleges that Greene performed only tax-related services prior to
       1990 (*see* TAC ¶ 8), the basis of Green's liability in this regard is unclear.

requests, Greene failed to provide additional statements and documentation from 1990 through 2014; (iii) MPS supplied certain Chase Bank statements in 2011, but omitted months during which, Plaintiff claims, Greene was transferring Plaintiff's money to avoid IRS garnishment; (iv) MPS ultimately sent six or seven boxes of records on April 18, 2012, but these were incomplete and missing hundreds of check records; (v) in August 2012, Plaintiff received an incomplete QuickBooks disk of accounting records; and (vi) in April 2013, MPS's counsel mailed Plaintiff "a completely blank JCI corporate kit."  (TAC ¶¶ 44, 46-50).

### c.      Mismanagement of Pension Fund Assets

Plaintiff next alleges that Greene breached his fiduciary duty by "taking substantial control over JCI and by mismanaging [Plaintiff's] money" that had been entrusted to Greene.  (TAC ¶ 55).  Plaintiff claims Greene was "a self-appointed trustee" to the JCI Pension Plan, and "had a joint Chase Bank account."  (*Id.* at ¶¶ 56-57).

Plaintiff further contends that Greene advised him, early in their relationship, that Plaintiff could invest "up to $30,000" into the JCI Pension Plan annually, which could mature to approximately $1,000,000 by the time of his retirement, "if contributions were made every year."  (TAC ¶ 64).[6]  After 18

---

[6]      Notably, Plaintiff does not allege that Defendants stated that they would deposit this amount annually irrespective of Plaintiff's income; rather, in the transcript provided by Plaintiff, Plaintiff asks "[t]hat pension thing ... that was the thing you were telling me about ... twenty thousand dollars and every nine years."  In response, Greene states:

> [I]f you just open a savings account in a regular savings bank and you put thirty thousand dollars there, in nine years the thirty thousand should double ... in another nine years it'll be worth a hundred and twenty

years, however, the account contained only $350,000. (*Id.*). Plaintiff notes that 18 years of contributions, at $30,000 per year, should yield a value of $540,000. (*Id.*).

As Plaintiff further alleges, there is "evidence of withdrawals from the pension" by Greene, including a $34,930 deposit and subsequent withdrawal on May 4, 2012, two weeks before Greene "remov[ed] himself as trustee." (TAC ¶ 58). Further, Plaintiff claims, the summary statements discussed above did not include pension and investment records, and the pension fund was liquidated in 2012 without Plaintiff's knowledge or consent. (*Id.* at ¶ 59). Plaintiff discovered these facts in February 2015. (*Id.* at ¶¶ 58-59).[7]

Next, Plaintiff claims that Greene opened an IRA account at a Citibank in Sonoma, California, without Plaintiff's knowledge; curiously, Plaintiff states that the account was opened in 1985, prior to the parties' services agreement. (TAC ¶ 62). Plaintiff also indicates that the account statements were being sent to an address where Plaintiff had not lived for approximately 10 years, and that Greene should have updated this mailing address. (*Id.*). Plaintiff further states

---

thousand, and in another nine years it'll be worth two hundred and forty thousand ... *assuming that the interest rate stays the same.*

(TAC, Ex. 1B (emphasis added)).

[7]    Plaintiff indicates that he sought, but had difficulties obtaining, pension records from the Kaufman Katz Financial Group at Morgan Stanley. (TAC ¶¶ 59-61). As Plaintiff states, employees of Kaufman Katz informed him that he "had to disengage Mr. Greene as trustee of JCI in order to withdraw money even though [Plaintiff] himself was also a trustee." (*Id.* at ¶ 61). The Court does not construe this as an allegation against Greene, as Plaintiff does not state that Greene was aware of or had any part in this issue, or that the Kaufman Katz group was a part of ABG Co. or MPS.

that, as of 2012, the IRA contained only $4,000, whereas Greene "should have been contributing funds to [it] annually."  (*Id.*).

Finally, Plaintiff alleges that Greene was responsible for overseeing Plaintiff's pension investment program, through which 45 CDs were purchased and sold.  (TAC ¶ 63).  Plaintiff claims that, per statements received from Kaufman Katz, the total amount used to purchase the CDs was $2,706,000, and the total sale price was $2,670,469; Plaintiff compares this to a $3,500 CD, which he purchased in 1985 and which doubled in value before he discovered, in 2010, that it had been garnished.  (*Id.*).

### d.    Failure to Disclose Disbursement of Checks

Plaintiff also alleges that Greene breached his fiduciary duty as an accountant by "not disclosing relevant facts regarding the payments and disbursements of checks."  (TAC ¶ 66).  Plaintiff states that between 2000 and 2004, Greene "wrote and disbursed 20 to 30 checks per month when 9 to 12 checks would have covered expenses."  (*Id.* at ¶ 67).  Further, Plaintiff states that (i) multiple checks were disbursed to unidentified recipients; (ii) certain checks written by Greene to Plaintiff's mother were never received; and (iii) there are "multiple reimbursed expenses" made by Greene, followed by disbursements to Plaintiff's account.  (*Id.* at ¶ 70).  Plaintiff claims that there is "at least $177,018 unaccounted for from undisclosed checks and disbursements."  (*Id.* at ¶ 71).

### e.   Overcharges of Fees

Plaintiff alleges defalcation of his assets.  In particular, he contends that, when the business relationship commenced, Greene gave him a set of largely blank documents to sign, which Plaintiff understood to be "Individual and Durable Powers of Attorney, Corporate Resolution papers and a Chase Bank signature card filled out in Mr. Greene's handwriting and giving Mr. Greene exclusive power on any and all Chase accounts."  (TAC ¶ 77).  Plaintiff claims that, in spite of requesting the fully executed documents at that time and since, he has never received them — he has only the "essentially blank signature forms."  (*Id.*).

More importantly, Plaintiff alleges that Greene breached his obligations "by secretly profiting from the fiduciary relationship," including by paying himself "un-agreed on expenses of approximately $5,000 per year, in addition to overcharging the agreed upon 5% of gross professional earnings" annually. (TAC ¶¶ 72-73).  Indeed, Plaintiff claims, "it appears" Greene "fraudulently paid himself approximately $75,000 a year to oversee JCI disguised as business expenses for JCI for over 20 years."  (*Id.* at ¶ 74).  In all, Greene "overpaid himself at least $90,476 in fees plus $105,000 in un-agreed to expenses and approximately $75,000 a year in fraudulently charged business expenses."  (*Id.* at ¶ 78).

Plaintiff states that he has sought copies of checks to "investigate" his suspicions of overpayment, but the checks he received from Chase Bank and JP Morgan Chase were unreadable.  (TAC ¶ 75).  Moreover, he claims, he was

"disenabled by MPS from receiving past statements online" due to a password issue in fall 2011, which "impeded progress toward filing this action." (*Id.* at ¶ 76).

### f.     Mismanagement of Personal Investments

Plaintiff next alleges that Greene breached his fiduciary duty as an accountant "by failing to invest [Plaintiff's] monies when [Plaintiff] reasonably believed they were being invested." (TAC ¶ 79). Plaintiff states that Greene represented that he would manage all investments in consultation with Plaintiff, but failed to consult Plaintiff and used brokers other than the individual suggested by Plaintiff. (*Id.* at ¶ 80).

### g.     Earnings and Payment Irregularities

Plaintiff claims Greene breached his fiduciary duty by "not acting solely for the benefit of [Plaintiff], to whom he owed the duty." (TAC ¶ 85). Specifically, Plaintiff alleges that Greene did not deposit the full value of Plaintiff's earnings into his bank accounts, noting specifically payments from "Sunset Boulevard" in 1994 and "Nothing Sacred ABC television series" in 1998. (*Id.* at ¶¶ 87-88).

Further, Plaintiff states that, in 2009, he was paid U.S. dollars for acting work overseas when he was supposed to be paid in British pounds; when part of his paycheck was effectively withheld, presumably by virtue of the exchange rate, Defendants were "unresponsive and ineffective" in helping him obtain the

13

remainder of this money.  (TAC ¶ 89).  Plaintiff indicates that he learned only in 2012 that he had been paid in U.S. dollars.  (*Id.*).[8]

### h.     Unapproved Money Transfers and Loan Repayments

Next, Plaintiff alleges that Greene's failure to "disclos[e] all relevant facts regarding money transfers and loan repayments" constituted a breach of his fiduciary duty as Plaintiff's accountant.  (TAC ¶ 91).  Plaintiff cites examples of "unexplained loan repayments made by Mr. Greene to Mr. Greene," in addition to "unexplained balance drops or missing funds from earnings in bank accounts."  (*Id.* at ¶¶ 94-95).  In all, Plaintiff alleges, these "loan repayments and money transfers" total at least $1,838,187."  (*Id.* at ¶ 96).

### i.     Undisclosed ATM Withdrawals

Plaintiff also claims that Greene breached his fiduciary duty as Plaintiff's accountant by "not disclosing all relevant facts regarding ATM withdrawals." (TAC ¶ 97).  Plaintiff refers to "excessive ATM Cash withdrawals" totaling at least $82,023, "not executed by [Plaintiff] or [Plaintiff's ex-wife]," noting that the withdrawal locations were not included on the summary statements.  (*Id.* at ¶¶ 98-99).

### j.     Unapproved Wire Transfers and Credit Card Transactions

Plaintiff next alleges that Greene's "unauthorized wire transfers and credit card transactions" breached his fiduciary duty as Plaintiff's accountant.

---

[8]     Plaintiff's contention on this point is unclear: he indicates that he only learned of the currency error in summer 2012 (TAC ¶ 89), leaving it unclear at what point he alleges Defendants were "unresponsive and ineffective" in attempting to obtain the outstanding payment (*id.*), unless this allegation relates solely to conduct post-dating the conclusion of Defendants' business relationship with Plaintiff.

(TAC ¶ 100).  In particular, Plaintiff states that MPS employees requested, from September 2009 to May 2010, that Plaintiff wire funds from his Royal Bank of Scotland account to his Chase account for "payroll," when in fact, JCI had been dissolved as of April 2009, unbeknownst to Plaintiff.  (*Id.* at ¶ 101).  In addition, he claims, credit card transactions "were made out to [Plaintiff's ex-wife]" over the course of 10 years beginning in 1996, but she "verified the moneys were never received."  (*Id.* at ¶ 102).  Further, Plaintiff listed a number of "unexplained credit card transactions including advanced credit card payments," totaling at least $263,284 in "undisclosed money transfers and credit card bills."  (*Id.* at ¶¶ 103-04).

### k.   Mismanagement of Treasury Bills

Plaintiff further claims that Greene's failure to "exercis[e] due care in the management" of Plaintiff's assets constituted a breach of his fiduciary duty. (TAC ¶ 105).  As Plaintiff explains, Greene opened a Bank of New York Treasury Bill account in January 1991, "without agreed upon consultation or [Plaintiff's] verbal or written consent," and then proceeded to short-sell Treasury Bills, "rampantly cash[ing] [them out] before they matured with no explanation or reason."  (*Id.* at ¶ 106).

Plaintiff alleges that "[i]n 1997 the JP Morgan Chase Securities account held $1,000,000 in [Treasury Bills] but by 2003 only $40,000 remained."  (TAC ¶ 107).  As he asserts, "[t]here is no record of what happened to the monies after the short sale[s]," and there are "$1,000,000 in Treasury bills unaccounted for and with undisclosed disbursement."  (*Id.* at ¶¶ 107-08).

### 1.    Mismanagement of JCI Corporate Accounts

Next, Plaintiff alleges that Greene breached his fiduciary duty "by
mismanaging [Plaintiff's] money and corporation that he entrusted" to
Defendants.  (TAC ¶ 109).  Plaintiff states that Greene filed for incorporation of
JCI on May 17, 1990, prior to the parties' agreement, and he failed to inform
Plaintiff when the State of New York dissolved JCI in 2009 for non-payment of
taxes.  (*Id.* at ¶¶ 110-11).  As Plaintiff claims, even when he asked Guttenberg
about JCI taxes in 2010, he "was not notified that JCI was dissolved in 2009."
(*Id.* at ¶ 112).[9]

Plaintiff makes a number of other assertions in connection with his
mismanagement allegations, the import of which are less clear to the Court.
For instance, he claims that (i) in February 1995, Greene "through JCI
advanced an undisclosed payment of $34495," which was "changed to Mr.
Anderson loan repayment" (TAC ¶ 114); (ii) Greene "used a different FEIN
[Federal Employer Identification Number] for JCI from 1997 onward" (*id.* at
¶ 115); and (iii) JCI "was not registered with NY state department of revenue as
of August 2012" (*id.* at ¶ 116).  Separately, Plaintiff claims that Greene
disbursed a $10,000 check issued to "K. Anderson" on October 10, 2002, listed
as "shareholder loans" on the summary statement; Plaintiff was not aware of

---

[9]     Plaintiff further states that the "JCI pension statements" provided by Kaufman Katz for
1999-2011 were incomplete.  (TAC ¶ 113).  Again, given that Kaufman Katz and its
employees are not named as Defendants or alleged to be under control of Defendants,
the Court does not attribute these claims to the named Defendants.

16

any loans and "was informed he was the sole shareholder for JCI." (*Id.* at ¶ 117).

### m.   Forgeries (Including Forged and Fraudulent Checks)

Finally, Plaintiff alleges that Greene "disburs[ed] forged and fraudulent checks," thereby violating his fiduciary duty.  (TAC ¶ 119).  As Plaintiff claims, Greene "paid utilities" for Plaintiff's rented home "when utilities were included in the rental lease" for that property.  (*Id.* at ¶ 123).  Plaintiff states that "[i]t is unknown whether checks were cashed by the landlord or whether they were added to the summary statement for utilities paid at an unknown property or were simply fabricated."  (*Id.*).  Plaintiff concludes that approximately $9,600 to $19,200 in utility payments are not accounted for, "with undisclosed disbursement."  (*Id.* at ¶ 124).

Plaintiff also asserts several acts attributable to Guttenberg; while Guttenberg is not named as a Defendant, the Court includes these allegations on the assumption that they could support liability for ABG Co. or MPS, or that they were directed by Greene and support liability against him.  First, Plaintiff claims that his former landlady informed him that one endorsed rent check contained a signature and handwriting different from hers, which Plaintiff alleges "resemble Mr. Guttenberg's handwriting."  (TAC ¶ 120).  Second, Plaintiff claims Guttenberg forged his signature on "an IRS corporate tax document," signing as JCI's President when that role belonged to Plaintiff.  (*Id.* at ¶ 121).  Last, Plaintiff alleges that Guttenberg notarized his divorce papers

17

with an expired notary stamp, "crossing out [the] expired date and adding [the] current date."  (*Id.* at ¶ 122).

### 5.    Plaintiff's Legal Malpractice Allegations Against Defendants

Plaintiff alleges that Greene acted as his attorney, and not merely his accountant, by (i) advising him on trusts and estate planning, including advice on how to "protect[] his assets through different legal entities"; (ii) counseling him, as his tax attorney, on "all aspects of his taxes and providing tax planning strategies";[10] (iii) providing legal advice, as an immigration attorney, during Plaintiff's "effort to obtain a green card for his then wife"; (iv) advising him, as a divorce attorney, regarding his separation, divorce, and post-nuptial agreement; and (v) drafting and negotiating Plaintiff's contracts.  (TAC ¶¶ 125-28, 131-34).  As further substantiation for his claim of an attorney-client relationship, Plaintiff notes that Greene used "Attorney at Law" letterhead in communications with Plaintiff and with attorneys on Plaintiff's behalf, and he also had power of attorney to control Plaintiff's finances.  (*Id.* at ¶¶ 129, 146).

Plaintiff claims that Greene failed to represent him adequately *as his attorney*, including by (i) preparing but failing to file Plaintiff's tax returns; (ii) controlling his finances, and "purport[ing] to invest them suitably and prudently," but then losing Plaintiff's money; (iii) assuming responsibility for

---

[10]    With regard to his tax returns, discussed at length above, Plaintiff again indicates that Greene "represented to [Plaintiff], in a letter sent to [Plaintiff] at the outset of their relationship, that he would be 'responsible for all tax returns, federal, state, local as well as gift, estate, or any others' and that he would 'assume responsibility in connection with ... taxes.'"  (TAC ¶ 145).  Plaintiff claims Greene "had authority to simply sign and file the tax returns on behalf of [Plaintiff] and, in fact, [Greene] signed and filed requests for extensions to file tax returns on behalf of [Plaintiff]."  (*Id.*).  The Court has not identified any factual allegations pertaining to tax-planning strategies.

paying "nearly all [Plaintiff's] bills," but then "allow[ing] creditors to attach liens to [Plaintiff's] property" when the bills were not paid; and (iv) creating (and becoming an officer of) JCI, but failing to keep it in good standing and ensure its tax returns were properly filed. (TAC ¶¶ 136-38, 140-41). Plaintiff alleges that Greene charged, for his accounting and legal work, 5% of Plaintiff's gross income, in addition to "un-agreed to costs and expenses." (*Id.* at ¶ 139).

Further, Plaintiff asserts that Greene never communicated the scope or fees of his representation or memorialized the parties' services agreement. (TAC ¶ 130). Finally, Plaintiff claims Greene never discussed any potential conflict of interest inherent in Greene's dual role as officer of JCI and advisor to Plaintiff. (*Id.* at ¶¶ 140-43).

**B.    Procedural Background**

On December 31, 2014, Plaintiff, proceeding *pro se*, filed his Complaint against Greene individually. (Dkt. #1). Three weeks later, on January 21, 2015, Plaintiff filed an Amended Complaint against Greene, ABG Co., and MPS. (Dkt. #3). On May 1, 2015, Defendant MPS requested a conference on its anticipated motion to dismiss (Dkt. #10), and on May 8, 2015, the Greene Defendants requested the same (Dkt. #14). On May 28, 2015, the Court held a conference, following which Plaintiff was granted leave to file his Second Amended Complaint ("SAC") on or before June 19, 2015. (Dkt. #23).

On June 9, 2015, Plaintiff requested a stay of the proceedings to permit him to hire an expert to assist with a "forensic financial analysis" in order to amend his complaint with "certainty" (Dkt. #24), which request Defendants

19

opposed (Dkt. #25).  The Court denied Plaintiff's request on June 15, 2015, explaining that Plaintiff was required, at the pleading stage, only "to demonstrate that he has legally viable claims that will entitle him to collect evidence in discovery in an effort to *prove* his claims."  (Dkt. #26 (emphasis in original)).  On June 29, 2015, Plaintiff filed his SAC (Dkt. #30), which, on July 13, 2015, each Defendant indicated it would move to dismiss (Dkt. #33, 34).

On September 11, 2015, Defendants filed their respective motions to dismiss the SAC.  (Dkt. #39, 42).  On September 15, 2015, Plaintiff requested and was granted an additional month — until November 12, 2015 — to file his response in opposition.  (Dkt. #51, 53).  Then, on October 5, 2015, Plaintiff sought leave to amend and file a Third Amended Complaint ("TAC") asserting constructive fraud claims (Dkt. #55), which request Defendants opposed on the grounds of futility and perceived dilatory tactics (Dkt. #56).  Citing the solicitude afforded *pro se* parties, the Court granted Plaintiff's request to file the TAC, but gave each Defendant an additional ten pages in which to respond to Plaintiff's added claims; the Court also permitted Plaintiff to file a sur-reply. (Dkt. #57).  On November 13, 2015, Plaintiff filed his response in opposition to Defendants' motions (Dkt. #60-64), and Defendants filed reply papers on December 3, 2015 (Dkt. #67-70).

On December 8, 2015, nine days before Plaintiff's sur-reply was to be filed, the Court received a letter from Ethan Brecher, prospective counsel to Plaintiff, seeking a 45-day extension for Plaintiff's sur-reply, along with leave to

file a Fourth Amended Complaint, "if the facts and law so warrant[ed]."  (Dkt. #72).  Struck by the timing of this request, in light of a prior order announcing no further extensions (Dkt. #57), the Court denied the request (Dkt. #74).  On December 17, 2015, still proceeding *pro se*, Plaintiff filed his sur-reply.  (Dkt. #76).

Upon reviewing the full briefing, the Court could not help but notice the volume of exhibits that were attached to Plaintiff's oppositions but had not been included in any prior iteration of Plaintiff's Complaint; it further noted that Defendants had similarly appended various documents to their motion papers (particularly in support of their limitations arguments) and had referenced Plaintiff's exhibits in reply.  (Dkt. #82).  Accordingly, the Court exercised its discretion under Federal Rule of Civil Procedure 12(d) to convert Defendants' Rule 12(b)(6) motions into Rule 56 motions for summary judgment insofar as they pertained to Defendants' statute of limitations defenses; any remaining claims would be assessed under Rule 12(b)(6).  (*Id.*).

In order to satisfy itself that Rule 12(d)'s notice requirement was fulfilled, the Court granted Plaintiff 21 days and an additional 10 pages to present pertinent material, followed by 14 days and 10 pages for each Defendant to provide additional argument.  (Dkt. #82).  The Court then granted Plaintiff, now counseled by Brecher, a one-week extension, and Plaintiff filed his supplemental briefing on June 9, 2016.  (Dkt. #85-87).  Defendant MPS filed its papers on June 23, 2016, and the Greene Defendants, following a one-week

extension, filed their papers on June 30, 2016, concluding briefing on all motions.  (Dkt. #88-92).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber*, 648 F.3d at 104 (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "While Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  *Id.* at 663.

22

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-60 (2d Cir. 2016).

Further, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (internal quotation marks omitted) (citing *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)); *accord McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).  "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended." *Hill* v. *City of New York*, No. 13 Civ. 8901 (KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks omitted).

## 2.    Conversion of a Rule 12(b)(6) Motion Into a Rule 56 Motion

Rule 12(d) of the Federal Rules of Civil Procedure provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  A district court may thus convert a motion to dismiss into a motion for summary judgment when the motion presents matters outside the pleadings, provided that the court gives "sufficient notice to an opposing party and an opportunity for that party to respond."  *Groden* v. *Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995).

"[C]are should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law."  *Ramsey* v. *Coughlin*, 94 F.3d 71, 73-74 (2d Cir. 1996) (quoting 6 MOORE'S FEDERAL PRACTICE ¶ 56.12, at 56-165 (2d ed. 1995)).  Where a court elects to consider materials outside the pleadings with regard to specific claims, the court may limit its conversion of the motion to those claims for which outside materials will be considered.  *See Alex* v. *Gen. Elec. Co.*, No. 12 Civ. 1021 (GTS) (CFH), 2014 WL 2510561, at *4 (N.D.N.Y. June 4, 2014) (stating that a court may "*partially* convert a motion to dismiss to a motion for summary judgment" (emphasis in original)); *Levy* v. *Aaron Faber, Inc.*, 148 F.R.D. 114, 117 (S.D.N.Y. 1993) (partially converting a motion to dismiss to one for summary judgment, on the limited issue of the statute of limitations).

In conjunction with their motion to dismiss, the Greene Defendants submitted, as an exhibit, Plaintiff's disciplinary complaint about Greene to the New York State Supreme Court's Departmental Disciplinary Committee (*see* Dkt. #41, Ex. B), along with Greene's response (*id.*, Ex. C).  And, in opposition to Defendants' motions to dismiss, Plaintiff submitted a wealth of exhibits purportedly substantiating his claims, including twenty exhibits in opposition to the Greene Defendants' motion and nine exhibits in opposition to MPS's motion.  (*See* Dkt. #63-64).  These included, *inter alia,* past correspondence — both letters and emails — with Defendants, Greene's response to Plaintiff's Departmental Disciplinary Committee complaint, a timeline created by Plaintiff of his communications with Defendants, account transcripts from the Internal Revenue Service, a divorce agreement drafted by Greene and post-nuptial agreement drafted by Greene and notarized by Guttenberg, and communications between Plaintiff and Don Fontana, an attorney hired by Plaintiff in 2012 to evaluate his IRS records.  (Dkt. #63-64).

"Where both parties submit extrinsic evidence in support of their positions, a district court may fairly convert a motion to dismiss into one for summary judgment under Fed. R. Civ. P. 56."  *Garcha* v. *City of Beacon*, 351 F. Supp. 2d 213, 216 (S.D.N.Y. 2005); *see also Carruthers* v. *Flaum*, 388 F. Supp. 2d 360, 378-79 (S.D.N.Y. 2005) (converting a motion to dismiss to one for summary judgment where both sides submitted documents outside the pleadings).

The Court stated in an Order dated May 12, 2016, that

25

> [g]iven the focused nature of Defendants' statute of
> limitations defenses, resolution of those defenses may
> greatly affect evaluation of Plaintiff's claims.   In the
> interest of efficiency and economy, the Court exercises
> its discretion to convert this motion to dismiss to a
> motion for summary judgment, only insofar as it
> pertains to Defendants' statute of limitations defenses,
> and to consider the evidence provided by the parties.

(Dkt. #82).  Because both sides received notice and an opportunity to respond

to the additional factual matter appended to the briefing — and Plaintiff even

retained the assistance of counsel at this stage — the Court exercises its

discretion to convert those portions of Defendants' motions to dismiss

addressing statute of limitations arguments into motions for summary

judgment.

### 3. Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), summary judgment may be

granted only if all the submissions taken together "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986); *accord Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party bears the initial burden of demonstrating "the absence

of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is

"material" if it "might affect the outcome of the suit under the governing law,"

and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also*

*Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

26

*Anderson*).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.

27

2003).  However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  And because Plaintiff was counseled at the time of his additional briefing on limitations issues, the Court need not construe his arguments in that regard as broadly as in the Rule 12(b)(6) context.

## B.    Analysis

Plaintiff brings two claims against all Defendants: (i) breach of fiduciary duty based on constructive fraud and (ii) legal malpractice.  With respect to the former, Plaintiff claims that "there existed a foregoing relationship of dependence and influence whereby each of the defendants had a fiduciary duty to act with utmost good faith, honesty, and loyalty toward [Plaintiff] and to not favor their own interests at the expense of the interests of [Plaintiff]."  (TAC ¶ 148).  Plaintiff claims Defendants breached this duty by "not disclosing relevant facts and making material misrepresentations and omissions, by not rendering accounts or by not keeping accurate records of the persons involved, of the dates and amounts of monies received, and of payments made, ... by failing to disclose material facts regarding the status of [JCI]," and by "mismanaging [Plaintiff's] finances and corporation."  (*Id.* at ¶ 149).

As for his legal malpractice claim, Plaintiff alleges that "through a foregoing attorney/client relationship between [Plaintiff] and the defendants,

there existed a foregoing relationship of dependence and influence whereby each of the defendants owed competent and skillful representation ... and to not favor their own interests at the expense" of Plaintiff's interests.  (TAC ¶ 152).  Plaintiff claims Defendants committed legal malpractice by "an abuse of [Plaintiff's] trust account, commingling trust account funds with the defendants' personal funds," and "other things."  (*Id.* at ¶ 153).

For the reasons articulated below, all of Plaintiff's claims are time-barred, with the exception of his claims relating to Defendants' failure to file his 2009 and 2010 tax returns.

### 1. Plaintiff's Amended Complaint Against MPS and ABG Co. Relates Back to the Initial Complaint Against Arthur B. Greene

A preliminary issue concerns the timing of Plaintiff's claims, and, more specifically, whether the claims brought against the corporate defendants in the Amended Complaint "relate back" to the date of the initial Complaint.  For an amended complaint to relate back to an initial complaint under Federal Rule of Civil Procedure 15(c)(1)(C), it must satisfy four criteria: (i) any new claim "must have arisen out of conduct set out in the original pleading"; (ii) any newly named defendant "must have received such notice that it will not be prejudiced in maintaining its defense"; (iii) any newly named defendant must have known that "but for a mistake of identity, the original action would have been brought against it"; and (iv) "the second and third criteria [must be] fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [must have been] filed within the limitations period."

29

*Barrow* v. *Wethersfield Police Dept.*, 66 F.3d 466, 468-69 (2d Cir. 1995) (citing *Aslanidis* v. *U.S. Lines, Inc.*, 7 F.3d 1067, 1075-76 (2d Cir. 1993)).

Here, the first prong is not seriously in dispute, and the fourth prong is at the heart of the remainder of this Opinion. However, Plaintiff faces a difficult burden at the third prong, as his initial Complaint evidences awareness of MPS's identity even as it fails to name it as a defendant. (*See* Dkt. #1 at ¶¶ 5(b), 6). Complicating the analysis further is Plaintiff's admission that, when filing his Complaint on December 31, 2014, he "realized that he did not have an address for [MPS]" and thus "could only fill in Arthur Greene's address which he knew from memory and was also partially printed on the General Complaint form." (Pl. MPS Opp. 5). Plaintiff indicates that "[w]hen turning in the handwritten complaint packet at [this District's] Pro Se office, he was assured that filing the complaint stops the statute of limitations and that he could add defendants within 21 days of the filing." (*Id.*). Plaintiff then states that, as he did not have a proper address for MPS, he "reasonably erred on the side of caution and waited until he obtained [MPS's] complete information rather than hand in an incomplete form without the proper address of one of the defendants." (*Id.* at 6).

Such statements suggest that Plaintiff did not merely suffer "a mistake of identity" as to MPS, but rather deliberately opted not to name MPS as a defendant. The Supreme Court has held, however, that the relevant inquiry under Rule 15(c)(1)(C)(ii) is "what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint

30

against the first defendant." *Krupski* v. *Costa Crociere S.p.A.*, 560 U.S. 538, 553-54 (2010).  Here, Plaintiff's initial Complaint asserted, in its "fraud" section, that from "2009 to May 2010 Anita Asmah and Richard Guttenberg (both employees at MPS) requested the Plaintiff to wire monies totaling approximately $30,000 from his Royal Bank of Scotland British account for 'payroll,' yet JCI was dissolved [on] April 29, 2009." (Dkt. #1 at ¶ 5(b)).  Later, Plaintiff alleges that Greene "partook of racketeering as defined by the Racketeer Influenced and Corruption Organizations Act (RICO) … us[ing] his business and employees to engage in a pattern of racketeering, committing two or more of the racketeering offenses, specifically embezzlement and fraud as listed in #4 and #5 above." (*Id.* at ¶ 6).  Accordingly, the Court finds that, under the Supreme Court's formulation, Defendants ABG Co. and MPS, as Greene's "business[es]," could reasonably expect that Plaintiff intended to assert a racketeering claim — by definition requiring more than one participant — against them.

While this analysis is an exceptionally close call for the Court, in light of Plaintiff's prompt amendment following his initial Complaint, its decision "is consistent with the purpose of relation back: to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Krupski*, 560 U.S. at 550.

Moreover, Plaintiff also meets the criteria for relation back under New York law.  Under Federal Rule of Civil Procedure 15(c)(1)(A), an amended

31

pleading relates back when relation back is permitted by "the law that provides
the applicable statute of limitations."  Under New York law, the doctrine
"permits a plaintiff to amend a complaint and add new defendants even
though, at the time of the amendment, the statute of limitations has expired."
*Beck* v. *Consol. Rail Corp.*, 394 F. Supp. 2d 632, 639-40 (S.D.N.Y. 2005) (citing
N.Y. C.P.L.R. § 203).  The party seeking to invoke relation back under New York
law must establish three elements: that "[i] both claims arose out of the same
conduct, transaction or occurrence; [ii] the new party is 'united in interest' with
the original party such that [it] can be charged with notice of the original action
and will not be prejudiced in maintaining a defense on the merits; and [iii] the
new party should have known that, but for a mistake as to the proper party,
the action would have been brought against [it] as well."  *Id.* (citing *Blakeslee* v.
*Royal Ins. Co. of Am.*, No. 93 Civ. 1633 (MBM), 1998 WL 209623, at *4
(S.D.N.Y. Apr. 29, 1998)).

Again, the claims asserted against all Defendants arise out of the same
conduct, transactions, and occurrences as those originally pleaded.  And with
regard to the second factor, under C.P.L.R. § 203, parties are "united in
interest" where "the interest of the parties in the subject-matter is such that
they stand or fall together and that judgment against one will similarly affect
the other."  *L&L Plumbing & Heating* v. *DePalo*, 677 N.Y.S.2d 153, 154 (2d Dep't
1998) (citing *Prudential Ins. Co.* v. *Stone*, 270 N.Y. 154, 159 (1936)).  Thus,
"interests will be united[] only where one is vicariously liable for the acts of the
other.  Underlying the doctrine of vicarious liability … is the notion of control.

32

The person in a position to exercise some general authority or control over the wrongdoer must do so or bear the consequences." *Walker* v. *Agro*, No. 96 Civ. 5414 (JG), 2000 WL 744536, at *4 (E.D.N.Y. May 19, 2000) (internal quotation marks and citation omitted).

Here, Defendants do not dispute that Greene worked as an accountant, first at ABG Co., and, beginning in 2009, at MPS.  While Defendants dispute the characterization of Greene's move to MPS as a "merger," MPS Managing Partner Mark Levenfus stated in his affidavit in support of MPS's motion to dismiss that in 2009, Greene and Guttenberg, "the principal partners in the accounting firm [ABG Co.], joined [MPS] as contract partners.  In connection with Greene and Guttenberg joining [MPS] as partners, [MPS] also acquired some, but not all, of the assets of ABG Co." (Levenfus Aff. ¶ 3).  Levenfus also stated that "ABG Co. remained responsible for its own liabilities after Greene and Guttenberg joined [MPS].  For example, ABG Co. maintained its own errors and omissions insurance, and proceeded to wind down its business in an orderly fashion, including satisfaction of its obligations and liabilities."  (*Id.* at ¶ 4).  Further, Levenfus explained, "the word 'merge' was not used in its technical or legal sense to indicate that the firms had merged, but, instead, in its common usage by laym[e]n to advise the clients that Greene and Guttenberg were now practicing as partners in [MPS]."  (*Id.* at ¶ 6).

In light of these statements, the Court deems the parties plausibly "united in interest," as Greene was first a partner at ABG Co. and later became a partner at MPS.  *See* N.Y. P'ship Law § 24 ("Where, by any wrongful act or

omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."). Absent indication that such provision does not apply, Greene is "united in interest" with MPS and ABG Co. in that "judgment against one will similarly affect the other." *See L&L Plumbing*, 677 N.Y.S.2d at 154.

With respect to the third factor, while worded similarly to the federal test for relation back, courts in New York "typically deem dispositive the presence or absence of bad faith on the part of the party seeking the amendment." *Walker*, 2000 WL 744536, at *4; *see also Buran* v. *Coupal*, 87 N.Y.2d 173, 181 (1995) (finding the third prong would not be met where "plaintiff omitted a defendant in order to obtain a tactical advantage in the litigation [by] ... intentionally decid[ing] not to assert a claim against a party known to be potentially liable"); *Blakeslee*, 1998 WL 209623, at *6 ("[U]nder this third prong of the test, courts should focus on whether the party invoking the relation back doctrine acted intentionally or in bad faith in not including all the appropriate parties in the original pleading."). Here, there is no evidence or indication that Plaintiff sought a "tactical advantage" by failing to name MPS or ABG Co. during the three-week span between his initial and amended Complaints. Plaintiff explains the delay as mere confusion about Defendant MPS's address and a misunderstanding, ostensibly engendered by the District's Pro Se Office, regarding the tolling of the statute of limitations. And since Defendants do not

34

contend that Plaintiff sought any advantage by filing an initial Complaint without naming MPS or ABG Co., the Court will not find such a motive.

Accordingly, Plaintiff meets the test under New York law for relation back of his Amended Complaint as against MPS and ABG Co.  To be sure, Plaintiff's arguments for relation back are by no means unimpeachable; however, the Court finds that the order of events satisfies Rule 15 and the underlying "preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits," rather than on technicalities.  *Krupski*, 560 U.S. at 550.

### 2.    Plaintiff's Claims for Breach of Fiduciary Duty Based on Constructive Fraud Are Time-Barred, with the Exception of Plaintiff's Claims Pertaining to His 2009 and 2010 Tax Returns

Under New York law, "the applicable statute of limitations for breach of fiduciary duty claims depends on the substantive remedy sought.  Where the relief sought is equitable in nature, the six-year limitations period of CPLR 213(1) applies."  *Kaufman* v. *Cohen*, 760 N.Y.S.2d 157, 164 (1st Dep't 2003).  However, if a plaintiff seeks money damages, "courts have viewed such actions as alleging 'injury to property,' to which a three-year statute of limitations applies."  *Id.*; *see also Carlingford Ctr. Point Assocs.* v. *MR Realty Assocs., L.P.*, 772 N.Y.S.2d 273, 274 (1st Dep't 2004) ("A breach of fiduciary duty claim is governed by either a three-year or six-year limitation period, depending on the nature of the relief sought.  The shorter time period applies where monetary relief is sought, the longer where the relief sought is equitable in nature." (internal citations omitted)).

### a.   Plaintiff's Claims Are Not Governed by the Six-Year Limitations Period for Constructive Fraud Actions

In his TAC and sur-reply papers, Plaintiff contends that his fiduciary duty claims sound in constructive fraud, and thus, they are subject to a six-year statute of limitations.  (Pl. Reply 1-6).  *See Balta* v. *Ayco Co.*, 626 F. Supp. 2d 347, 356 (W.D.N.Y. 2009) ("[C]laims for breach of fiduciary duty that sound in fraud are subject to a six-year statute of limitations, even when the relief sought is money damages.").  Defendants rejoin that Plaintiff's assertion of constructive fraud cannot save his claims, and they remain subject to the three-year statute of limitations governing fiduciary duty claims seeking money damages.  (Greene Reply 3-10; MPS Reply 7-12).  The Court finds Defendants' arguments to be supported by the law: Plaintiff's late assertion of constructive fraud cannot render his claims timely.

Even "[a]ssuming that fraud has been pled adequately, whether a plaintiff may take advantage of the longer limitations period turns on whether the fraud claim is 'essential' to the breach of fiduciary duty claim, or whether the fraud claim is 'incidental' to the fiduciary duty claim."  *Matana* v. *Merkin*, 957 F. Supp. 2d 473, 492 (S.D.N.Y. 2013).  "Where the alleged fraud is merely 'the means of accomplishing the breach and add[s] nothing to the causes of action ...,' the statute of limitations applicable to fraud claims will not control."  *Powers Mercantile Corp.* v. *Feinberg*, 490 N.Y.S.2d 190, 193 (1st Dep't 1985) (quoting *Iandoli* v. *Asiatic Petroleum Corp.*, 395 N.Y.S.2d 15, 15 (1st Dep't 1977)); *cf. Garber* v. *Ravitch*, 588 N.Y.S.2d 163, 164 (1st Dep't 1992) ("Where an allegation of fraud is not essential to the cause of action pleaded, [and] its

36

only purpose [is] to avoid an anticipated defense of the Statute of Limitations," the shorter limitations period of a replevin action applied).[11]

In other words, "[a] fraud action is not incidental only when: [i] the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; and [ii] the injuries caused by the fraud are distinct from the injuries caused by the alternate claim." *Corcoran* v. *N.Y. Power Auth.*, 202 F.3d 530, 545 (2d Cir. 1999). Where a plaintiff's "allegations of breach of fiduciary duty are substantially identical to its allegations of fraud," "the injuries alleged in the two claims are not distinct." *Matana*, 957 F. Supp. 2d at 492. In that case, the statute of limitations applicable to the breach of fiduciary duty claim will control. *Id.* at 492-93.

Plaintiff's constructive fraud claims are a thinly-disguised effort to circumvent the limitations period for his fiduciary duty claims, as revealed by the evolution of his pleadings in this case. As in *De Carlo*, upon the filing of Defendants' motions to dismiss, Plaintiff sought leave to file his Third Amended Complaint; the only change from its predecessor was the repeated inclusion of the phrase "based on constructive fraud" following the phrase "breach of

---

[11]     *See generally De Carlo* v. *Ratner*, 204 F. Supp. 2d 630 (S.D.N.Y. 2002):

> Upon learning that [the defendant] planned to oppose this action on statute of limitations grounds, [plaintiff] amended his complaint to include a fraud claim…. [Plaintiff] argues that his fraud claim is governed by the six year statute of limitations … and that it therefore is not time-barred. We reject [plaintiff's] argument for several reasons. First, he simply has not pleaded a cause of action in fraud distinct from his malpractice claim. In applying the Statute of Limitations we look for the reality, and the essence of the action and not its mere name.

*Id.* at 637 (internal quotation marks and alteration omitted).

fiduciary duty." (*Compare* SAC § III.B, ¶ 1, p. 36 ("FIRST CAUSE OF ACTION –
COUNT I: Breach of Fiduciary Duty"); *with* TAC § III.B, ¶ 1, p. 37 ("FIRST
CAUSE OF ACTION – COUNT I: Breach of Fiduciary Duty based on
Constructive Fraud")).  Other than this incantation, Plaintiff did not amend the
relevant factual allegations in any way.  Significantly, however, Plaintiff's
claims in this case sound in fiduciary duty — as discussed above, he alleges
that Defendants "routinely mismanage[d]" his finances; failed to prepare, send,
or file his taxes; "fail[ed] to invest funds carefully, prudently, and promptly";
failed to recommend "a new investment strategy where warranted by a change
in circumstances"; failed to retain Plaintiff's documents; dismissed Plaintiff's
"many requests"; and "divert[ed] and drain[ed] [Plaintiff's] investment and
pension account leaving him essentially homeless and almost completely
bankrupt."  (TAC ¶ 18).

Plaintiff recites a host of facts regarding these claims, but even assuming
that such allegations amount to properly pleaded constructive fraud, they
constitute only "the means of accomplishing the breach[es]" of fiduciary duty
that are at the heart of his Complaint.  *Iandoli*, 395 N.Y.S.2d at 15.  Because
Plaintiff fails to plead constructive fraud that occurred separately from and
subsequent to the injuries at the base of his complaints, he does not receive
the benefit of the six-year statute of limitations.

### b.    Plaintiff's Claims Are Not Governed by the Six-Year Statute of Limitations for an Accounting

Additionally, Plaintiff contends that his claims are subject to the six-year
statute of limitations governing actions for equitable relief, as Plaintiff has

requested an accounting in the TAC.  (Pl. Greene Opp. 20; Pl. Reply 6-7).  An accounting is an "equitable remedy … designed to require a person in possession of financial records to produce them, demonstrate how money was expended and return pilfered funds in his or her possession."  *Roslyn Union Free Sch. Dist.* v. *Barkan*, 16 N.Y.3d 643, 643-44 (2011).  Under New York law, to bring a claim for an accounting, a plaintiff must allege "[i] relations of a mutual and confidential nature; [ii] money or property entrusted to the defendant imposing upon him a burden of accounting; [iii] that there is no adequate legal remedy; and [iv] in some cases, a demand for an accounting and a refusal."  *Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 207 (S.D.N.Y. 2011) (quoting *IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)).

Plaintiff's argument does not suffice to give him the benefit of the longer limitations period.  Even if Plaintiff has properly pleaded the first two prongs, he falls short in demonstrating the inadequacy of a legal remedy.  *See CSI Inv. Partners II, L.P.* v. *Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) ("An accounting claim is not proper where money damages are recoverable under alternative causes of action for the same injury"), *aff'd*, 328 F. App'x 56 (2d Cir. 2009) (summary order).

More pointedly, "[w]here there are concurrent remedies at law and in equity, the plaintiff cannot enlarge the limitations period for the claim seeking damages relief by also seeking equitable relief," and "the request for equitable relief in the form of … an accounting does not enlarge the limitations period for

the claim for money damages." *ABS Entm't, Inc.* v. *CBS Corp.*, No. 15 Civ. 6801 (JGK), 2016 WL 676464, at *3 (S.D.N.Y. Feb. 18, 2016) (internal citations, quotation marks, and alterations omitted); *see also Klein* v. *Bower*, 421 F.2d 338, 344 (2d Cir. 1970) ("New York courts have long held that a prayer for equitable relief will not bring an action under the longer limitations period for equity actions when full relief can be granted at law.  The prayer for an accounting … [is] not enough to bring the action within the longer equity period." (internal citations omitted)).

Still further, "an accounting is unnecessary when an underlying legal action exists, and is properly dismissed when the legal action is time-barred." *Pons* v. *People's Republic of China*, 666 F. Supp. 2d 406, 415 (S.D.N.Y. 2009); *see also Arrow Commc'ns Labs.* v. *Pico Prods. Inc.*, 632 N.Y.S.2d 903, 905 (4th Dep't 1995) ("Where a party seeks an accounting, but the primary demand is for monetary damages, the accounting is merely a method to determine the amount of monetary damages.  The action therefore sounds in law and not in equity."  (internal quotation marks and alterations omitted)).

Here, Plaintiff seeks substantial money damages, including compensatory damages of $3,900,000, statutory treble damages, lost wages in the amount of $1,200,000, lost pension funds in the amount of $300,000 plus interest, legal fees in the amount of $100,000, and unspecified punitive damages.  (TAC § V ¶¶ 1, 3-5, 7-8).  Throughout the TAC, however, Plaintiff reiterates his request for an accounting.  (*See, e.g., id.* at ¶¶ 65 ("The true nature of missing monies from the pension fund is not known until

40

accountings of the pension fund have been made."), 71 ("The true nature and sum of the undisclosed checks and disbursements made by Mr. Greene is not known until accountings of the checks and disbursements have been made."), 78 ("The true nature and sum of overpayments [of fees] made by Mr. Greene is not known until accountings of the overpayments have been made."), 84 ("The true nature and sum of all investments made by Mr. Greene is not known until accountings of the investments have been made."), 90 ("The true nature and sum of missing and unaccounted for funds is not known until an accounting of [Plaintiff's] earnings has been made."), 96 ("The true nature and sum of the loan repayments and money transfers are unknown until an accounting has been made."), 99 ("The true sum and nature of the undisclosed ATM withdrawals remain unknown until an accounting of the withdrawals has been made."), 104 ("The true sum and nature of the [unexplained money] transfers and [credit card] bills is unknown until an accounting of them has been made."), 108 ("Until an accounting is made, the true nature and sum of the missing monies from the T-bills is unknown."), 118 ("The true nature of JCI as created and used as a corporation to benefit [Plaintiff] is not known until an accounting of the corporation has been made."), 124 ("Until an accounting is made, the true nature and sum of the undisclosed disbursements and forged checks is unknown.")).  Moreover, in his Prayer for Relief, Plaintiff requests "[a]n equitable accounting of missing monies and investments, and undisclosed disbursements."  (*Id.* at § V ¶ 9).

Plaintiff now contends that "whenever there is a fiduciary relationship between the parties, as is the situation here, there is an absolute right to an accounting notwithstanding the existence of an adequate remedy at law." (Pl. Supp. Br. 6 (citing *Koppel* v. *Wien, Lane & Malkin*, 509 N.Y.S.2d 327, 330 (1st Dep't 1986)). Without conceding the point, the Court observes that Plaintiff has not brought a claim for an accounting; rather, as in the cases cited above, Plaintiff has brought a claim for money damages and asserted a request for an accounting as a method of determining those damages. As such, a concurrent remedy at law exists, as damages would be recoverable under Plaintiff's claims. Accordingly, the shorter statute of limitations governs. *See ABS Entm't, Inc.*, 2016 WL 676464, at *3; *Klein*, 421 F.2d at 344.

Because Plaintiff primarily seeks money damages, and discovery as to the measure of those damages will be available to him should he move forward on those claims, he "can obtain all the information [he] seek[s] in [his] existing claims at law," and "no useful purpose would be served by treating [his] equitable accounting claim as an additional, and duplicative, action at law." *Leveraged Leasing Admin. Corp.* v. *PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996). Thus, assuming Plaintiff can demonstrate a fiduciary relationship warranting an accounting, this nevertheless does not suffice to bring his claims under the six-year limitations period. Rather, they remain subject to the three-year statute of limitations governing his requests for damages.[12]

---

[12]    Along the same lines, the TAC seeks "a constructive trust [to] be imposed on all property owned, in whole or in part, by Defendants which was acquired, in whole or in part, by Defendants with the funds misappropriated from the Plaintiff[']s accounts."

### c.   Plaintiff's Claims Are Time-Barred Absent a Basis for Tolling

Having determined that a three-year statute of limitations applies to Plaintiff's claims for breach of fiduciary duty, *see Kaufman*, 760 N.Y.S.2d at 164, the Court must now determine when each claim accrued.  "A claim for breach of fiduciary duty generally accrues at the time of breach." *Barnett* v. *Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 391 (E.D.N.Y. 2014) (citing *Malmsteen* v. *Berdon, LLP*, 369 F. App'x 248, 249-50 (2d Cir. 2010) (summary order)).  Here, unless any of the alleged breaches of fiduciary duty accrued on the very day MPS terminated its services — which Plaintiff does not suggest — Plaintiff's claims are not timely absent some reason to toll the statute of limitations.  Indeed, many of Plaintiff's claims accrued years before the end of the relationship.

With regard to Plaintiff's tax-related claims, the latest alleged failure by Defendants occurred in 2011.  Even giving Plaintiff the benefit of a renewed statute of limitations for each year in which Defendants did not file his taxes, Plaintiff's claim in 2011 for failure to file his personal taxes would have accrued on April 18, 2011, or on October 17, 2011, if Defendants had sought an extension from the Internal Revenue Service.[13]  Further, assuming Plaintiff has

---

(TAC § 5.A ¶ 2).  While a constructive trust claim "is governed by the six-year statute of limitations provided by CPLR 213(1)," *Kaufman*, 760 N.Y.S.2d at 171, the shorter statute of limitations governs when legal remedies will "afford[] plaintiff[] full and complete relief," *Gold Sun Shipping Ltd.* v. *Ionian Transp. Inc.*, 666 N.Y.S.2d 677, 678 (2d Dep't 1997).

[13]   The Court takes judicial notice of the Internal Revenue Service's 2011 Tax Calendar, published to the public at https://www.irs.com/articles/2011-tax-calendar, and the

standing to assert claims on behalf of the corporate entity JCI — an assumption that Defendants persuasively refute (*see* Greene Br. 22, 24-25; Greene Reply 5 n.6) — Plaintiff's claim for failure to file JCI's corporate taxes would have accrued at the deadline for fourth-quarter filings on December 15, 2011, more than two weeks prior to the termination of MPS's services.  (*Id.*).[14]

With respect to the asserted "incomplete records and omission of data," Plaintiff alleges that Greene "breached his fiduciary duty by not disclosing all relevant facts relating to matters regarding [Plaintiff's] finances."  (TAC ¶ 41). Plaintiff ties this to his receipt of monthly summary statements, indicating that these statements "contained unexplained large transactions and failed to provide full, detailed, and accurate account of all monies" (*id.* at ¶43), and that they failed to conform to GAAP standards (*id.* at ¶ 52).  Further, Plaintiff asserts that "[a]fter over 30 requests to provide the [corresponding] records," Greene continued to refuse to do so.  (*Id.* at ¶ 46).  Plainly, both Defendants' failures to provide complete and adequate accounting records and Greene's alleged refusal to turn over supporting documentation accrued when those breaches first occurred, well before the termination of MPS's services on December 31, 2011.  Accordingly, those claims are not timely absent an independent reason to toll the statute of limitations.

---

fact that the IRS will grant an individual taxpayer a filing extension until October of the same year.

[14]   Again here, the Court takes judicial notice of the fourth quarter filing deadline for corporations, pursuant to the Internal Revenue Service's 2011 Tax Calendar.  *See* https://www.irs.com/articles/2011-tax-calendar.

Similarly, Plaintiff claims Greene mismanaged his pension fund, stating that Greene, "as [Plaintiff's] accountant, breached his fiduciary duty by taking substantial control over JCI and by mismanaging [Plaintiff's] money that he entrusted to [ ] Greene." (TAC ¶ 55). Along the same lines, Plaintiff contends that Greene mismanaged Plaintiff's investments "by failing to invest [Plaintiff's] monies when [Plaintiff] reasonably believed they were being invested." (*Id.* at ¶ 79). Given that all of this alleged mismanagement necessarily began prior to MPS's resignation as Plaintiff's accountants, the statute of limitation for these claims also expired prior to the filing of Plaintiff's Complaint.

With regard to Plaintiff's claim that Greene "breached his fiduciary duty by not disclosing relevant facts regarding the payments and disbursement of checks," Plaintiff contends that "[b]eginning 2000 through 2004," Greene "excessively wrote and disbursed 20 to 30 checks per months when 9 to 12 checks would have covered expenses." (TAC ¶¶ 66-67). Plaintiff also references checks with "unidentified recipients" in 1991 and 1995, and purportedly problematic "reimbursed expenses" in 2003. (*Id.* at ¶¶ 68, 70). As all of these events took place well over three years prior to Plaintiff's filing, claims premised upon them are not timely.

Further, Plaintiff contends that Greene "breached his fiduciary duty by secretly profiting from the fiduciary relationship," and specifically, Defendant "paid himself for un-agreed upon expenses of approximately $5,000 per year in addition to overcharging the agreed upon 5% of gross professional earnings commission fee from late 1990 through 2011." (TAC ¶ 73). Given that this

45

breach accrued in 1990, when Greene allegedly began paying himself in excess of the fee to which Plaintiff agreed, this claim is not timely under the three-year statute of limitations.[15]

A review of Plaintiff's other claims reveals similar timeliness issues. Plaintiff's claims regarding "unexplained loan repayments" and "unexplained balance drops" recite a list of examples, the latest of which occurred in November 2004, more than ten years prior to Plaintiff's initial Complaint. (*See* TAC ¶¶ 93-95). Likewise, Plaintiff's claims regarding "undisclosed ATM withdrawals" only allege withdrawals made as late as 2003. (*Id.* at ¶ 98). And, Plaintiff's allegations pertaining to "unapproved wire transfers and credit card transactions" relate, in the latest instance, to transactions that occurred in May 2010. (*Id.* at ¶¶ 101-03). Accordingly, the statute of limitations has expired on all of these claims.

With regard to Plaintiff's claims of mismanagement of Treasury Bills, Plaintiff alleges that Greene "breached his fiduciary duty by not exercising due care in the management of [Plaintiff's] assets," including by "rampantly

---

[15]    An argument could be made that each year of alleged overpayment began anew the three-year limitations period for this claim, such that Plaintiff's contention regarding the outsized 2011 commission fee might be viable. However, in the exhibits submitted with his Opposition to the Greene Defendants, Plaintiff details (i) his earnings that year, (ii) 5% of that figure, (iii) the actual amount of Greene's fee, and (iv) the amount by which he believes Greene over- or underpaid himself. (*See* Pl. Greene Opp., Ex. 8). For 2010, for instance, Plaintiff indicates that he earned $85,895.69, 5% of which would be $4,294.50; Greene paid himself $3,407, constituting an underpayment of $887.50. (*Id.*). For 2011, however, Plaintiff states that he earned $8,317.03, but no charged fee is listed, and Plaintiff instead states, "NOTE: THEY HAVE DROPPED ME AS CLIENT.  NOT DOING 2011 TAXES." (*Id.*). Accordingly, even if these payments were considered severable, Plaintiff has not alleged facts suggesting any 2011 fee, much less one paid on December 31, 2011, and he has in fact produced documents suggesting that no such fee was paid in that year.

cash[ing] out T-bills before they matured with no explanation or reason." (TAC ¶¶ 105-06). However, the latest Treasury Bill transaction alleged by Plaintiff occurred between August and November of 2005 (*id.* at ¶ 107), rendering these claims untimely as well.

Plaintiff further alleges mismanagement of JCI's corporate accounts, stating that Greene failed to "exercise due care in the management of [Plaintiff's] corporation," including by failing to notify Plaintiff of the corporation's dissolution by New York State in 2009. (TAC ¶¶ 109, 112). Separately, Plaintiff references an "undisclosed payment" through JCI in February 1995, an unexplained "disbursed check" in October 2002, and Greene's "use[] [of] a different [Federal Employer Identification Number] for JCI from 1997 onward." (*Id.* at ¶¶ 114-15). As none of these allegations relate to actions within three years prior to Plaintiff's Complaint, they are not timely.

Finally, Plaintiff alleges that Greene "breached his fiduciary duties by disbursing forged and fraudulent checks," but again he fails to allege any acts occurring within the three-year period prior to filing his Complaint. (TAC ¶ 119). Plaintiff states that "[on] May 21, 2014, at ~9:00 a.m., Peggy Anderson, landlady for loft at 39 Spring Street, New York City, New York, 10012 stated that the signature on Check 7126 was not her signature.... The false signatures resemble Mr. Guttenberg's handwriting." (*Id.* at ¶ 120). While this claim is not untimely on its face, Plaintiff submitted an affidavit from Peggy Anderson in conjunction with his opposition, affirming that she was his "landlady from January to June of 1999 and September 2003 to June of 2004," meaning that

any check to her would have been written no later than 2004.  (Pl. Reply 14).
Apart from this, Plaintiff references Guttenberg "forg[ing]" Plaintiff's signature
"on an IRS corporate tax document in 2009," and notarizing a divorce
document with an expired notary stamp.  (*Id.* at ¶¶ 121-22).  As the rent check
claim occurred outside the three-year window, and the divorce-related
documents submitted by Plaintiff are dated 2003 (*see* Pl. Greene Opp., Ex. 12),
these claims are untimely as well.  Plaintiff relatedly contends that Greene
"paid utilities March 1995 to March 2003 when utilities were included in the
rental lease" for Plaintiff's residence, and "[i]t is unknown whether checks were
cashed by the landlord or whether they were added to the summary statement
for utilities paid at an unknown property or were simply fabricated."  (TAC
¶ 123).  Even were any of these alleged actions to amount to a breach of
fiduciary duty, the action would have occurred more than three years prior to
Plaintiff's initial Complaint.

    In sum, because none of the alleged breaches occurred within three
years of Plaintiff's Complaint, Plaintiff's argument based on the continuing
violations doctrine, raised in his counseled supplemental briefing, is
unavailing.  (*See* Pl. Supp. Br. 3 n.2).  As Plaintiff correctly references, the
continuing violations doctrine "applies to a series of fiduciary violations, 'where
fiduciaries repeat violations of the same character over and over.'"  (*Id.* (citing
*L.I. Head Start Child Dev. Servs., Inc.* v. *Econ. Opportunity Comm'n of Nassau
County, Inc.*, 558 F. Supp. 2d 378, 401 (E.D.N.Y. 2008))).  Even accepting
Plaintiff's assertion that the doctrine applies to his claims, it would not suffice

48

to toll the statute of limitations beyond the last action taken by Defendants, which occurred more than three years prior to Plaintiff's filing.

The Court further observes that in the TAC, Plaintiff terms the transcript of his December 4, 1990 meeting with Greene a "verbal contract."  (TAC ¶ 23).  However, Plaintiff simultaneously acknowledges that Greene "didn't have written contracts with any of his clients" (*id.*), thereby casting significant doubt on whether Greene intended to enter any verbal contract.  Moreover, "[a] plaintiff faces a heavier burden when trying to prove an alleged oral contract.  To ensure that parties are not trapped into surprise contractual obligations that they never intended, *more than agreement on each detail is required*, [and] there must be an overall agreement to enter into the binding contract."  *Cleveland Wrecking Co.* v. *Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 293 (E.D.N.Y. 1998) (internal quotation marks and citations omitted) (emphasis added).  Here, neither the "prospectus" nor the transcript offered by Plaintiff evidences any mutual intent to enter a binding agreement.  In light of this absence, and Greene's undisputed refusal to enter a written contract for his services, the Court will not evaluate Plaintiff's claims under a breach of contract theory, Plaintiff's reference to their discussion as a "verbal contract" notwithstanding.[16]

---

[16]    Notably, Plaintiff's counsel on summary judgment briefing did not raise a breach of contract theory as a rationale to extend the limitations period.  Nonetheless, in light of Plaintiff's *pro se* status throughout the proceedings prior, the Court has evaluated whether the TAC could adequately plead such a claim.

As noted above, Plaintiff does not indicate in the TAC or any briefing that any of the alleged actions underlying the asserted breaches of fiduciary duty occurred on or after the date on which MPS terminated its services, thereby severing any fiduciary ties between Plaintiff and Defendants.  Nonetheless, the Court has evaluated Plaintiff's allegations individually and come to the conclusion that all of the alleged actions must have predated December 31, 2011, and thus all are untimely unless Plaintiff presents sufficient justification for extending the relevant statute of limitations.  The Court will now consider each of Plaintiff's proffered bases for tolling.

### d.   The Statute of Limitations Is Not Tolled by the Open Repudiation Doctrine

Plaintiff alleges that (i) "[i]n an email to [him], MPS dropped [him] as a client effective December 31, 2011 without completion of paid for work," and (ii) "Mr. Greene resigned as trustee of JCI Defined Contribution Pension Plan on May 18, 2012."  (TAC ¶¶ 25-26).  Plaintiff then states that "[i]n some actions involving breach of fiduciary duty, a special tolling rule provides that … the statute of limitations (whether six years for claims seeking equitable relief or three years for money damages) is tolled until the relationship terminates or the fiduciary 'openly repudiates' his or her fiduciary obligations, whichever occurs first."  (*Id.* at ¶ 27).  In his supplemental briefing, Plaintiff reiterates this argument, contending that MPS repudiated its relationship on December 31, 2011, and that Greene repudiated his relationship — at the earliest — on May 18, 2012, "when he stepped down as lawyer and trustee of the JCI pension account."  (Pl. Supp. Br. 8).  Further, Plaintiff argues that Greene's

letter, which was written on MPS letterhead, "indicates he [was] working on the JCI pension account on behalf of MPS," and thus, "[t]he May 18, 2012 date should apply to all of the Defendants when calculating the open repudiation date." (*Id.* at 8-9). Plaintiff's arguments miss the mark.

"Under New York law, the limitations period for claims arising out of a fiduciary relationship does not commence 'until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated.'" *Golden Pac. Bancorp* v. *F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001) (quoting *Westchester Religious Inst.* v. *Kamerman*, 691 N.Y.S.2d 502, 503 (1st Dep't 1999)). "In such cases, the 'statutory period [is] tolled between the alleged fiduciary misconduct' and the date on which the fiduciary relationship is openly repudiated or otherwise ended, so that any misconduct alleged before that end date 'falls within the permissible temporal scope.'" *Id.* at 519 (quoting *Kamerman*, 691 N.Y.S.2d at 503). Significantly, however, "[t]he open repudiation doctrine applies only [ ] to claims for equitable relief, and not to claims for money damages." *Willensky* v. *Lederman*, No. 13 Civ. 7026 (KMK), 2015 WL 327843, at *10 n.21 (S.D.N.Y. Jan. 23, 2015); *see also Kaszirer* v. *Kaszirer*, 730 N.Y.S.2d 87, 88 (1st Dep't 2001) ("[T]he requirement of a clear repudiation applies only to claims seeking an accounting or other equitable relief.").

As noted above, while Plaintiff asserts the need for an accounting, the TAC ultimately sounds in law and merely seeks an accounting as a method of determining damages, rather than as a separate equitable claim. *See supra* at

51

38-42; *cf. Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit* v. *BNY Mellon, N.A.*, No. 11 Civ. 6345 (RJS), 2012 WL 3930112, at *9 (S.D.N.Y. Sept. 10, 2012) ("[T]he open repudiation doctrine is inapplicable to Plaintiffs' claim because the doctrine only applies to the six-year statute of limitations for equitable relief — not the three-year period for monetary damages."); *see also NEM Re Receivables, LLC* v. *Fortress Re, Inc.*, — F. Supp. 3d —, No. 15 Civ. 3875 (VM), 2016 WL 3144390, at *5 (S.D.N.Y. May 5, 2016) (rejecting open repudiation argument where plaintiff "failed to meet at least one of the remaining requirements for a claim of accounting," namely, the absence of an adequate remedy at law) (opinion denying reconsideration).  Accordingly, despite Plaintiff's request for an accounting to determine his prospective legal damages, the open repudiation doctrine will not serve to toll the statute of limitations.  Using a similar analysis, the Court rejects Plaintiff's claim (*see* Pl. Supp. Br. 8-9) that the statute of limitations for the entirety of the TAC is tolled until May 18, 2012, when Greene resigned as Trustee of the JCI Pension Plan; rather, as discussed above, any claim for redress concerning the pension plan accrued when Greene's alleged mismanagement began.

### e.   The Statute of Limitations Is Not Tolled by Equitable Tolling or Equitable Estoppel

In the alternative, Plaintiff notes that "equitable estoppel permits circumstances to extend the three-year limitations period when a plaintiff is 'prevented from asserting their claims by some kind of wrongful conduct on the part of the defendant,'" and argues that "[a]t every turn, [Plaintiff] was denied access to his records from Mr. Greene et al and began making discoveries only

after obtaining records through his own tireless efforts by various other means." (TAC ¶ 54). In his supplemental briefing, Plaintiff adds that the monthly summary statements were "deceptive, incomplete, misleading, and fraudulent," which he claims "prevented [him] from discovering the Defendants['] breaches of fiduciary duty and malpractice," consequently inducing him to refrain from filing a timely action. (Pl. Supp. Br. 9).

As the Second Circuit has explained, "[e]quitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri* v. *Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004). Specifically, "equitable tolling has been held appropriate where plaintiff filed and served defective papers before the expiration of the statutory period, or where defendant induced plaintiff to file late through trickery or deception." *Id.* at 322-23 (internal citation omitted). "Equitable tolling has also been held appropriate where plaintiff was somehow prevented from learning of [his] cause of action within the statutory period." *Id.* at 323. Further, in instances of "fraudulent concealment," or "[w]here defendant is responsible for concealing the existence of plaintiff's cause of action," the Second Circuit has found equitable tolling warranted. *Id.* In sum, "[t]he relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Id.*

53

Here, Plaintiff has neither pleaded nor presented facts demonstrating that Defendants "induced [him] to file late through trickery or deception"; rather, he contends that they "denied [him] access to his records," presumably to delay him in filing his Complaint.  (TAC ¶ 54).  However, numerous documents submitted by the parties — documents that Plaintiff possessed or prepared long before the filing of the Complaint or the expiration of the statute of limitations — belie these contentions.  For instance, in an October 10, 2011 letter from Plaintiff to Greene, Plaintiff raised accusations of tax evasion, larceny, embezzlement, and misappropriation of funds, and stated, "[y]ou have breached your fiduciary duty.  You have breached our contract.  You have been negligent.  There has been malpractice.  And I believe, without question or doubt, that fraud is involved."  (Pl. Greene Opp., Ex. 3).

On February 16, 2012, Plaintiff filed a complaint concerning Greene with the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department.  (Kolatch Decl., Ex. B).  In it, Plaintiff outlined his grievances against Greene, including: (i) breach of fiduciary duty, involving, *inter alia*, "[n]on-notification of IRS delinquencies," "[r]efusal and failure to provide accounting records, bank account statements, and documentation," "[n]on-filing of taxes for 8 straight years," and "[d]ropping [Plaintiff] as client with paid for work not completed"; (ii) breach of contract, involving, *inter alia*, overcharges of Greene's commission fee, non-filing of taxes, making investments and opening accounts without consultation, and "[p]oor investment strategy"; (iii) malpractice and negligence, involving, *inter*

54

*alia*, falsely re-filing delinquent taxes, failing to send regular summary statements, making "[m]isleading and untruthful statements," making large transactions not verified by the summary statements, and performing "[s]hoddy, sloppy[] accounting work"; (iv) misappropriation of funds, involving missing money, large unauthorized debits and "[u]nexplained large transactions"; and (v) fraud, involving "[u]nderreporting of income, over-reporting expenses," "IRS fraud," acting on behalf of a corporation which had been dissolved, "[m]issing money," and shifting Plaintiff's money — including to Greene's account — without Plaintiff's knowledge.  (*Id.*).

Later, on December 28, 2013, Plaintiff wrote a letter to Mark Levenfus, Managing Director of MPS, stating that Plaintiff had reviewed tax returns and monthly statements from Greene, had compared these against earnings statements, and had determined that "[t]here [was] money missing," and "[i]t [was] a very large number."  (Pl. Greene Opp., Ex. 16).  In a letter to Greene on the same date, Plaintiff made the same assertions and demanded reimbursement "for [ ] missing and unaccounted for funds, fraudulent checks and transactions, [and] any incurred costs and lost interest suffered by [Plaintiff] due to [Greene's] and [MPS's] gross and extreme negligence."  (*Id.*).

Plaintiff's numerous accusations of wrongdoing, including tax evasion, breaches of contract and fiduciary duty, malpractice, negligence, and fraud, in conjunction with his particularized assertions to the Departmental Disciplinary Committee, evince an awareness, years before the expiration of the statute of limitations, of the substance of the instant action.  While Plaintiff may have

wanted additional documents to bolster these claims, his purportedly unmet requests cannot suffice to show that Defendants somehow obstructed Plaintiff's awareness of his claims.  Defendants' alleged failure to produce these documents does not constitute "trickery or deception" intended to impede Plaintiff's complaint until after the limitations period, particularly as Plaintiff's filings and correspondence show a continuing and growing disaffection with Defendants' services and responses.  Accordingly, given the content of Plaintiff's numerous allegations and threats of legal action (at least one of which came to fruition in Plaintiff's Disciplinary Committee complaint against Greene), he cannot reap the benefit of equitable tolling.

### f.   Plaintiff's Claims Regarding His 2009 and 2010 Tax Returns Are Timely Under the Continuous Representation Doctrine

Plaintiff further contends that the statute of limitations for his claims should be tolled under the continuous representation doctrine under New York law, by virtue of Plaintiff's "all-encompassing" relationship with Defendants. (Pl. Supp. Br. 6-7).  Under New York law, "[c]ontinuous representation tolls the statute of limitations until an accountant stops rendering professional services to his or her client on a particular matter." *Cuccolo* v. *Lipsky, Goodkin & Co.*, 826 F. Supp. 763, 768 (S.D.N.Y. 1993) (citing *Muller* v. *Sturman*, 437 N.Y.S.2d 205, 207-08 (4th Dep't 1981)); *see also Zaref* v. *Berk & Michaels, P.C.*, 595 N.Y.S.2d 772, 774 (1st Dep't 1993) (finding the doctrine applicable where the defendant advises the client "in connection with the particular transaction

56

which is the subject of the action and not merely during the continuation of a general professional relationship") (internal citations omitted).

Notably, "[t]he mere recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original services," *Hall & Co., Inc.* v. *Steiner & Mondore*, 543 N.Y.S.2d 190, 192 (3d Dep't 1989), and the doctrine's application is limited "to instances where the professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship," *Muller*, 437 N.Y.S.2d at 207. "Thus, unless services relating to the particular transaction sued upon were rendered within the limitation period, even the defendant's 'general and unfettered control of [the plaintiff's] financial, tax and investment affairs' … is 'insufficient to sustain the timeliness' of the action." *Booth* v. *Kriegel*, 825 N.Y.S.2d 193, 195 (1st Dep't 2006) (citing *Zaref*, 595 N.Y.S.2d at 774).

In his submissions, Plaintiff claims that the continuous representation doctrine must toll all of his claims, as the Defendants had previously provided "nearly complete financial planning, accounting, and legal services." (Pl. Supp. Br. 7-8). However, as noted above, a comprehensive relationship in and of itself does not suffice to establish continuing representation, *see Booth*, 825 N.Y.S.2d at 195, and in order for his claims to be timely, Plaintiff must instead demonstrate a mutual understanding of the continuation of services pertaining to a particular task or undertaking until at least December 31, 2011.

57

Defendants, in response, cite the continuous representation standard in legal malpractice cases, which requires "a predicate of continuing trust and confidence" between attorney and client. *De Carlo*, 204 F. Supp. 2d at 636. This standard has not clearly been transferred, however, to the accounting context, rendering Defendants' arguments on that point inapposite. In any event, as discussed below, the parties evidence — at least in part — "a mutual understanding of the need for further representation on the specific subject matter" at issue, the concept at the heart of the doctrine. *Symbol Tech., Inc.* v. *Deloitte & Touche, LLP*, 888 N.Y.S.2d 538, 541 (2d Dep't 2009) (internal quotation marks omitted).

In a timeline submitted by Plaintiff of "Record Requests/Emails" (Pl. Opp., Ex. 9), Plaintiff indicated that on December 16, 2011, he received an email from "A. Forslund," identified as "MPS General Counsel," repudiating Defendants' "representation and services including taxes and book keeping." Plaintiff also made a note that "MPS will provide all records in MPS possession upon complet[ion] of tax returns or shortly after 1/15/2012." (*Id.*). In an email to Levenfus dated December 29, 2011, with the subject line "Discontinuation of services," Plaintiff stated that he "reject[ed] and [did] not accept [Defendants'] random date to discontinue any services," and demanded certain documents and information and completion of a number of tax returns. (*Id.*). Then, in a further email to Plaintiff dated January 6, 2012, Thomas Manisero of MPS stated:

> Indeed, it appears that you do not appreciate that MP&S is not obligated to continue providing professional services for or on your behalf effective December 31, 2011. A mutual agreement to this effect is not required…. To be clear, MP&S has resigned as your accountants effective December 31, 2011. You will be well advised to engage new accountants. *MP&S will work to finalize your 2009 and 2010 tax returns so long as they can be completed within the next 30 days*, and will cooperate with the transition to new accountants in accordance with its professional obligation.

(TAC Ex. C (emphasis added)).

In light of this representation by Manisero, the Court finds that there is a genuine issue of material fact regarding the parties' understanding of continuing work by Defendants MPS and Greene on Plaintiff's 2009 and 2010 tax returns, each of which may be deemed a "particular transaction" governed by the doctrine of continuing representation.[17]  Apart from these two returns, Plaintiff has not adequately alleged, and the record does not demonstrate, mutual understanding of any other work to be performed.  Accordingly, while Plaintiff's other claims are not saved by his assertion of continuous representation, his allegations pertaining to his 2009 and 2010 tax returns must be evaluated on their merits under Rule 12(b)(6).

### 3. Plaintiff's Has Adequately Alleged a Claim for Breach of Fiduciary Duty Regarding His 2009 and 2010 Tax Returns

"To prevail on a claim for breach of fiduciary duty under New York law, a plaintiff must prove [i] a breach by a fiduciary of obligations to another, [ii] that

---

[17]    Because Defendant ABG Co. had ceased to exist or was in the process of winding up its business at the time of this communication (*see* Levenfus Aff. ¶ 4), the Court finds that the continuous representation doctrine applies here only to Defendants MPS and Greene.

the defendant knowingly induced or participated in the breach, and [iii] that the plaintiff suffered damages as a result of the breach." *Cohen* v. *Cohen*, 993 F. Supp. 2d 414, 427 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Pokoik* v. *Pokoik*, 982 N.Y.S.2d 67, 70 (1st Dep't 2014) ("To establish a breach of fiduciary duty, [a plaintiff] must prove the existence of a fiduciary relationship, misconduct by the other party, and damages directly caused by that party's misconduct."). "The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care." *Grund* v. *Del. Charter Guar. & Trust Co.*, 788 F. Supp. 2d 226, 249 (S.D.N.Y. 2011).

With regard to the first prong, "[a] fiduciary relationship exists under New York law when one … is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." *Flickinger* v. *Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation marks omitted); *cf. Facella* v. *Fed'n of Jewish Philanthropies of N.Y., Inc.*, No. 98 Civ. 3146 (DAB), 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) ("New York courts conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge."). "As such, courts cannot determine the existence of a fiduciary relationship by recourse to rigid formulas." *Kottler* v. *Deutsche Bank AG*, 607 F. Supp. 2d 447, 465 (S.D.N.Y. 2009) (internal quotation marks omitted).

Typically, "the accountant-client relationship does not generally give rise to a fiduciary relationship absent special circumstances," such as the

accountant's commission of affirmative fraud on a client.  *VTech Holdings Ltd.*
v. *Pricewaterhouse Coopers LLP*, 348 F. Supp. 2d 255, 268 (S.D.N.Y. 2004)
(internal footnote omitted).  Still, New York courts have recognized that a "role
as [ ] financial advisor with discretionary authority to manage [ ] investment
accounts" can create a fiduciary duty.  *Brooks* v. *Key Trust Co. Nat'l Ass'n*, 809
N.Y.S.2d 270, 273 (3d Dep't 2006).  However, "courts routinely have held that
conclusory allegations of a special relationship [or] complete trust and
confidence are insufficient to state a claim of a fiduciary duty."  *Abercrombie* v.
*Andrew Coll.*, 438 F. Supp. 2d 243, 275 (S.D.N.Y. 2006) (internal quotation
marks omitted).

Plaintiff contends generally in the TAC that Greene "represented
[Plaintiff] as his lawyer, tax advisor, CPA, bookkeeper, financial planner,
investment advisor, and overall business manager from 1990 through at least
2012."  (TAC ¶ 8).  More specifically, Plaintiff contends that Defendants
mismanaged his investments (*id.* at ¶¶ 79-80) and Treasury Bills (*id.* at ¶¶ 105-
08), which might give rise to fiduciary duty on the theory of discretionary
authority.  *See Brooks*, 809 N.Y.S.2d at 273.

However, with regard to his *timely* claims — the non-filing of his 2009
and 2010 taxes — Plaintiff does not allege Defendants' commission of
affirmative fraud, but rather claims that Defendants *negligently* failed to file his
tax returns or to notify him of the "IRS delinquencies, liens, levies, and
garnishment warnings."  (TAC ¶¶ 28, 29).  Thus, the survival of these claims
hinges on Plaintiff's assertion of "special circumstances" elevating his

negligence-based tax return claims to breaches of fiduciary duty by
Defendants.  Here, Plaintiff alleges that (i) Defendants were entirely responsible
for preparing and filing his taxes but failed to do so (*id.* at ¶¶ 9, 29); and
(ii) Defendants received all of Plaintiff's mail, and thus received numerous IRS
notices informing them of the delinquencies in Plaintiff's taxes, but failed to
inform Plaintiff  (*id.* at ¶¶ 3, 29).  Accordingly, Plaintiff contends that he was
entirely reliant on Defendants to take care of his taxes (or to inform him of any
issues), warranting a duty on Defendants' part to act within the scope of that
agreement and permitting inference of the "special circumstances" required for
a fiduciary relationship.  *See Flickinger*, 947 F.2d at 599.

> The Court finds these allegations suffice to plead the existence of a
fiduciary duty in this regard.  That said, it remains skeptical that Plaintiff will
ultimately be able to substantiate all of his factual assertions, particularly his
claims that Defendants were responsible for signing *and* filing Plaintiff's taxes
on his behalf.  Nonetheless, taking the factual assertions as true at this stage,
Plaintiff has adequately alleged a fiduciary relationship.  Beyond this, Plaintiff
has alleged that Defendants knowingly participated in the breach of this
relationship, by virtue of their receipt and neglect of the relevant delinquency
notices, allegedly allowing Plaintiff to accrue a tax liability of approximately
$100,000 (TAC ¶ 28); as a result, Plaintiff has properly pled the remaining
factors involved in a breach of fiduciary duty claim.

### 4.   Plaintiff's Legal Malpractice Claims Are Untimely and Inadequate on the Merits

In the TAC, Plaintiff asserts a number of legal malpractice claims against all three Defendants, based on Greene's work over the years.  Specifically, Plaintiff alleges that Greene served as his attorney in a number of specific capacities: (i) as his trusts and estates attorney, advising Plaintiff on protecting his assets (TAC ¶ 125); (ii) as his tax attorney, "advising him on all aspects of his taxes and providing tax planning strategies" (*id.* at ¶ 126); (iii) as his immigration attorney, helping Plaintiff obtain a green card for his then-wife (*id.* at ¶ 127); and (iv) later, as his divorce attorney (*id.* at ¶ 128).  More generally, Plaintiff claims Greene helped to draft and negotiate Plaintiff's business contracts, and to handle his finances, including his taxes and estate planning. (*Id.* at ¶¶ 131-32).

Plaintiff contends that Defendants, through Greene, committed legal malpractice principally by (i) failing to file Plaintiff's tax returns (TAC ¶ 136); (ii) controlling Plaintiff's finances but failing to invest his savings prudently (*id.* at ¶ 137); (iii) failing to pay Plaintiff's bills promptly (*id.* at ¶ 138); and (iv) failing to keep JCI in good standing (*id.* at ¶ 140).[18]  Plaintiff further alleges that Defendants violated a number of New York's Rules of Professional Conduct, including by (i) failing to communicate adequately the scope of Greene's representation, or his rate or expenses, as required by Rule 1.5(b) (*id.* at ¶ 130); (ii) "neglect[ing] a legal matter" by failing to keep JCI in good standing

---

[18]   Here, too, the Court is doubtful that Plaintiff has standing to raise claims on behalf of JCI.

and failing to file Plaintiff's taxes as required by Rule 1.3(b) (*id.* at ¶¶ 139-41, 144-45); and (iii) entering a conflicted business transaction with a client — *i.e.*, serving as Secretary and Treasurer of JCI for Plaintiff — without advising Plaintiff to seek independent counsel, in violation of Rules 1.7 and 1.8 (*id.* at ¶¶ 141-43).  Further, Plaintiff alleges that "Defendants breached their duties of care, skill, and diligence by, among other things, an abuse of [Plaintiff's] trust account, commingling trust account funds with the defendants' personal funds."  (*Id.* at ¶ 153).  As set forth in the remainder of this section, the claims fail on multiple grounds.

### a.    Plaintiff's Legal Malpractice Claims Are Time-Barred

Under New York law, the statute of limitations for a legal malpractice claim is three years.  N.Y. C.P.L.R. § 214(6).  "It is well-established that a cause of action for legal malpractice accrues on the date of the allegedly improper action, not on the date when the malpractice was discovered," *Xie* v. *Lin*, No. 06 Civ. 142 (HB), 2007 WL 423806, at *3 (S.D.N.Y. Feb. 7, 2007), "even if the aggrieved party is then ignorant of the wrong or injury," *Ackerman* v. *Price Waterhouse*, 84 N.Y.2d 535, 541 (1994).

Here, Plaintiff does not allege any malpractice in the context of Greene's immigration or divorce work.  Rather, his allegations center on Defendants' purported failure to file Plaintiff's tax returns;[19] their failure to invest Plaintiff's savings well, promptly pay his bills, or keep JCI in good standing; and Greene's

---

[19]    As noted above, Plaintiff's contention relates to Defendants' alleged failure to file his tax returns, rather than any purported negligence in the context of tax-planning services.

decision to enter a business transaction with Plaintiff (through JCI) while
serving as his attorney.  (TAC ¶¶ 136-38, 140).  All of these claims — for the
same reasons cited with regard to Plaintiff's breach of fiduciary duty
claims — accrued more than three years before Plaintiff's filing of this suit, as
all occurred before the date on which MPS sent its letter formally revoking its
representation of Plaintiff.  (*See supra* at 43-50).  Moreover, as discussed in the
context of Plaintiff's fiduciary duty arguments and again below, Plaintiff's
arguments for tolling the statute of limitations are ineffectual.

### i.      The Doctrine of Continuous Representation Will Not Toll the Statute of Limitations for Plaintiff's Legal Malpractice Claims

As in the context of his fiduciary duty claims, Plaintiff asserts that the
statute of limitations for his legal malpractice claims should be tolled by the
doctrine of continuous representation.  Plaintiff is correct that "the statute [of
limitations] may be deemed tolled under the theory of continuous
representation until the attorney ceases representing the client in the specific
matter at issue."  *Nobile* v. *Schwartz*, 56 F. App'x 525, 526 (2d Cir. 2003)
(summary order); *see also Shumsky* v. *Eisenstein*, 96 N.Y. 2d 164, 167-68
(2001) ("[A]pplication of the continuous representation or treatment doctrine
is … generally limited to the course of representation concerning a specific legal
matter.").  However, unlike in the accounting context, which merely requires a
mutual understanding of continued work on a specific issue, in the legal
malpractice context, "[f]or the continuous representation doctrine to apply, a
predicate of continuing trust and confidence must exist," and "if there is a

breakdown in that relationship, the doctrine is not applicable." *De Carlo*, 204

F. Supp. 2d at 636.  For instance, where it is

> clear from correspondence written by the plaintiff that
> he perceived that his relationship with his attorneys
> had been "irretrievably broken" prior to the formal
> termination of this relationship … "the relationship
> necessary to invoke the continuous treatment rule did
> not persist until formal termination of the nominal
> representation by defendants, but rather ceased with
> the disruption of the client's trust and confidence."

*De Carlo*, 204 F. Supp. 2d at 636-37 (quoting *Aaron* v. *Roemer, Wallens &*

*Mineaux, LLP*, 707 N.Y.S.2d 711, 714 (3d Dep't 2000)).

      While Plaintiff successfully argued that Defendants undertook

continuous representation in the accounting context by virtue of their promise

to attempt to complete Plaintiff's 2009 and 2010 tax returns, Plaintiff's

argument fails in any attorney-client context because he cannot demonstrate

continued "trust and confidence."  On October 10, 2011, almost one year after

discovering that certain of his monies had been garnished due to a tax lien,

Plaintiff wrote a letter to Greene outlining his frustrations and his suspicions of

wrongdoing.  (Pl. Greene Opp., Ex. 3).  In the letter, Plaintiff accused

Defendants of withholding information about IRS warnings and the dissolution

of JCI, stating "[t]his, I believe, is called fraud.  You were putting me in

incredible harm's way by not informing me of what you were doing with my

corporation.…  If that doesn't breach any reasonable interpretation or notion of

fiduciary duty, then I seriously do not know what does."  (*Id.*).  Later in the

letter, Plaintiff states that he "entrusted [Defendants] with [his] life and [his]

future," but "[t]hat trust has been severely broken, almost gone."  (*Id.*).

Moreover, in the letter, Plaintiff accuses Greene of tax evasion, and "quite

possibly larceny, embezzlement, or misappropriation of funds."  (*Id.*).  Plaintiff

states that "after a relationship of 25 years, [he felt] an extreme and utter sense

of betrayal" and was "truly devastated."  (*Id.*).  Toward the end of the letter,

Plaintiff writes that "[i]f [he did] not get paid back for these various offenses and

negligence, [he would] expose and prosecute whoever ha[d] done [him] wrong."

(*Id.*).  He concludes, "[y]ou have breached your fiduciary duty.  You have

breached our contract.  You have been negligent.  There has been malpractice.

And I believe, without question or doubt, that fraud is involved."  (*Id.*).

In light of this letter, which predated the filing of Plaintiff's Complaint by

more than three years, Plaintiff could hardly argue that there was an ongoing

relationship of "trust and confidence" that extended past October 2011; rather,

as in *De Carlo*, the "correspondence written by the plaintiff [demonstrates] that

he perceived that his relationship with his attorneys had been 'irretrievably

broken' prior to the formal termination of this relationship."  204 F. Supp. 2d

at 636-37.  Accordingly, the doctrine of continuous representation cannot serve

to toll Plaintiff's legal malpractice claims.

> ### ii.     Equitable Estoppel and Equitable Tolling Will Not Toll the Statute of Limitations for Plaintiff's Legal Malpractice Claims

Plaintiff also contends that equitable estoppel should toll the statute of

limitations for his malpractice claims, as "Defendants[] cannot be allowed to

escape their obligation to [Plaintiff] due to their own fraudulent misstatements

and omissions." (Pl. Supp. Br. 9).  As described above, "[e]quitable tolling is an

extraordinary measure that applies only when [a] plaintiff is prevented from

filing despite exercising that level of diligence which could reasonably be

expected in the circumstances." *Veltri*, 393 F.3d at 322.  And, as this Court

has already found, Plaintiff possessed *and prepared* a number of

documents — including the October 2011 letter — underscoring his awareness

of these claims long before the expiration of the statute of limitations.  *See*

*supra* at 54-56.  In sum, for the same reasons discussed in the context of

Plaintiff's fiduciary duty claims above, equitable estoppel and equitable tolling

will not save his legal malpractice claims.

### b.   Plaintiff Fails to State a Claim for Legal Malpractice

Plaintiff's legal malpractice claims also fail on the merits.  Under New

York law,

> [a] cause of action for legal malpractice poses a question
> of law which can be determined on a motion to dismiss.
> In order to state a claim for legal malpractice under New
> York law, a plaintiff must adequately allege [i] an
> attorney-client   relationship,   and   [ii]   attorney
> negligence, [iii] which is the proximate cause of[]
> [iv] actual damages.

*Kirk* v. *Heppt*, 532 F. Supp. 2d 586, 591 (S.D.N.Y. 2008) (internal citations

omitted).  With regard to the first factor, "[i]t is fundamental that an *explicit*

*undertaking* to perform a *specific task* is required to establish an attorney-client

relationship." *Mason Tenders Dist. Council Pension Fund* v. *Messera*, 4 F. Supp.

2d 293, 298 (S.D.N.Y. 1998) (emphases in original) (internal quotation marks

omitted).  "A party's unilateral belief that one is his or her attorney is not

68

dispositive," and "[w]hile there can be an attorney-client relationship without a former retainer letter and without compensation, their absence may support the proposition that no attorney-client relationship was intended." *Secured Worldwide, LLC* v. *Kinner*, No. 15 Civ. 1761 (CM), 2015 WL 4111325, at *3 (S.D.N.Y. June 24, 2015).

At the outset, Plaintiff faces a difficult burden alleging legal malpractice against two accounting firms; both MPS and ABG Co. assert that they cannot be held liable for attorney malpractice, as they operate solely as accounting firms. (Greene Br. 25; Greene Reply 19; MPS Br. 1-2, 9; MPS Reply 2, 18-19). In his opposition papers, Plaintiff contends that "[i]t is widely recognized that the 'Big Four' accounting firms are basically, for all intents and purposes, law firms. Being one of the 30 largest firms on the eastern seaboard, it is disingenuous for MPS to state otherwise." (Pl. MPS Opp. 7-8). The Court does not find Plaintiff's mere assertion of similarities to be persuasive, as accounting firms plainly are not one and the same as law firms. *See Cahill* v. *Contemporary Perspectives, Inc.*, No. 81 Civ. 7754 (LBS), 1986 WL 4696, at 86 (S.D.N.Y. Apr. 15, 1986) ("Under New York law, there must be an attorney-client relationship before an attorney is deemed to owe a duty to a client such that a claim for legal malpractice may lie. As [defendant] indisputably was not an attorney, he could not have had an attorney-client relationship with [plaintiff]." (internal citations and footnote omitted)). However, because both ABG Co. and MPS employed Greene at various times, and because Greene was in fact a lawyer, the Court will proceed, for purposes of argument, on the

assumption that those firms may be held liable for any malpractice committed by Greene in his capacity as an attorney.

Even construing the pleadings liberally, Plaintiff fails to state a claim for legal malpractice; for each claim, he either (i) fails to plead the existence of an attorney-client relationship or, where the Court will assume an attorney-client relationship existed, (ii) fails to allege that Defendants' conduct amounted to negligence that proximately caused actual damages.

For the most part, Plaintiff's claims for legal malpractice duplicate his claims for breach of fiduciary duty: Plaintiff contends that Greene (i) "prepared [Plaintiff's] tax returns (and then failed to file them)" (TAC ¶ 136); (ii) "controlled [Plaintiff's] savings and purported to invest them suitably and prudently (and then lost nearly all of his life savings)" (*id.* at ¶ 137); and (iii) "paid nearly all of [Plaintiff's] bills for him, including his monthly credit card bills, rent payments, and car payments (and then allowed creditors to attach liens to his property after he failed to pay [Plaintiff's] bills)" (*id.* at ¶ 138).  As evidenced by the "prospectus" and the transcript Plaintiff appended to the TAC, Defendants' work on Plaintiff's taxes and finances, discussed at length above, related to Greene's role as Plaintiff's business manager, accountant, and investment manager.

Put simply, Plaintiff fails to allege that Greene specifically undertook to provide legal services in any of these areas; with respect to Plaintiff's taxes, Plaintiff alleges only that Greene "advis[ed] him on all aspects of his taxes and

provid[ed] tax planning strategies" (TAC ¶ 126),[20] and in the context of his finances, Plaintiff claims that Greene "handled nearly every aspect of [Plaintiff's] finances, and advised him on tax consequences and estate planning matters" (*id.* at ¶ 132).  All of these allegations are consistent with Plaintiff's earlier claims regarding Defendants' breach of fiduciary duty, and they do not establish an "explicit undertaking" to provide legal advice, as required for a claim of legal malpractice.

Along the same lines, Plaintiff's assertion that Greene "represented that he would 'assume responsibility in connection with insurance, taxes, wills, trusts and estate planning and investments'" (TAC ¶ 134), fails for the same reasons.  While Plaintiff cites a portion of the "prospectus" letter stating that Defendants "tr[ied] to become involved in every aspect of [their] clients' activities" (*id.*), the remainder of the letter makes clear that there was no agreement to provide any services, including legal services:

> Our responsibility would cover all financial planning and handling and we would be available for advice and supervision of all of your assets and property.  *I am sure you realize that it is difficult to explain all of the details in writing but perhaps this letter should be just introductory and I would be pleased to answer any questions you may have.*

---

[20]   Even if Plaintiff's reference to "providing tax planning strategies" (TAC ¶ 26) suggests performance by Greene of legal work, Plaintiff does not allege negligence in this regard.  Rather, his tax-related allegations focus on Defendants' alleged failure to prepare and file his taxes, a duty discussed in the context of the accounting services Defendants offered.  (*See* TAC, Ex. 1A, 1B).

(*See* TAC Ex. A (emphasis added)).  Nowhere in the prospectus, nor in the transcript of Plaintiff's meeting with Greene, does Greene reference or discuss legal representation.  (*See generally id.*).

Again, Plaintiff does not establish any explicit undertaking by Greene to provide legal advice on a specific issue or matter, and Plaintiff's mere belief that Greene was working broadly as his attorney — in fact "blurr[ing] the line between being [Plaintiff's] attorney and being his accountant" (TAC ¶ 135) — does not suffice to plead such a relationship.  Indeed, Plaintiff admits in the TAC that Greene "had no written contract with [Plaintiff]" and "[t]he scope of [Greene's] representation was never defined."  (*Id.* at ¶ 130).  While Plaintiff alleges generally that Greene "represented himself on his letterhead as 'Arthur B. Greene, Attorney at Law'" and "communicated with other attorneys on behalf of [Plaintiff] on the firm letterhead, both expressly and impliedly representing to other attorneys that [Defendant] was [Plaintiff's] attorney" (*id.* at ¶ 129), such allegation is insufficient to demonstrate an explicit undertaking to perform legal work on some specific matter, *see Mason Tenders*, 4 F. Supp. 2d at 298, much less that the work was performed in a negligent manner leading to damages.  Accordingly, even taking such representation as true, it cannot save Plaintiff's legal malpractice claims.

For certain other claims unrelated to Defendants' accounting or investment management services, Plaintiff fails to allege that Greene acted negligently or proximately caused any damages.  Specifically, with regard to Plaintiff's claims that Defendant (i) represented him "as his immigration

attorney providing legal advice and services for [Plaintiff] as part of his effort to obtain a green card for his then wife" (TAC ¶ 127); (ii) represented him "as his divorce attorney, providing legal advice regarding separation and divorce, composing post-nuptial agreement" (*id.* at ¶ 128); and (iii) "drafted and negotiated nearly every contract [Plaintiff] entered into in his career" (*id.* at ¶ 131), Plaintiff does not allege any negligence or resultant damages.  Further, even if Plaintiff had adequately pled that Greene engaged in such legal work separate and apart from his work on Plaintiff's taxes and investments, this would not suffice to establish a general attorney-client relationship covering those other matters.  *See Mason Tenders*, 4 F. Supp. 2d at 298 (requiring "an *explicit undertaking* to perform a *specific task*" (emphasis in original)).

Separately, Plaintiff asserts a number of claims based on violations of the New York Rules of Professional Conduct: (i) failure to communicate the scope of representation and basis or rate of fees and expenses as required by Rule 1.5(b) (TAC ¶¶ 130, 139); (ii) neglect of a legal matter entrusted to the lawyer, including by failing to keep JCI in good standing and failing to file Plaintiff's taxes, as required by Rule 1.3(b) (*id.* at ¶¶ 139, 141, 144-45); (iii) representation of Plaintiff in spite of a "significant risk that the lawyer's professional judgment … will be adversely affected by [his] own financial, business, property or other interests," based on Greene's role as Secretary and Treasurer of JCI, in violation of Rule 1.7 (*id.* at ¶¶ 141-43); and (iv) entry "into a business transaction with a client" without advising Plaintiff to seek independent counsel, again based on his role as Secretary and Treasurer of

73

JCI, in violation of Rule 1.8 (*id.*).  However, violations of the Rules of Professional Conduct give rise to no private right of action.  *See Jiau* v. *Hendon*, No. 12 Civ. 7335 (PAE), 2014 WL 559004, at *6 (S.D.N.Y. 2014) ("[T]hat [Plaintiff] has alleged violations of New York's Rules of Professional Conduct does not ... rescue [his] legal malpractice claim.  The ethical rules governing lawyers have their own means of enforcement; a violation of such a rule does not, without more, give a client or former client a malpractice claim."); *see also Arkin Kaplan LLP* v. *Jones*, 840 N.Y.S.2d 48, 51 (1st Dep't 2007) ("[E]ven if a violation of the Code of Professional Responsibility had occurred, that, in itself, would not create a private right of action.").

Accordingly, this Court will not find validly pled legal malpractice claims based on Plaintiff's assertion of these violations.  And, because Plaintiff has otherwise failed to plead an attorney-client relationship in conjunction with negligence causing actual damages, his legal malpractice claims must be dismissed.

## CONCLUSION

For the reasons stated in this Opinion, all of Plaintiff's claims are time-barred, with the exception of his claims against Greene and MPS for breach of fiduciary duty relating to his 2009 and 2010 tax returns.  As Plaintiff has adequately stated a claim for breach of fiduciary duty against those Defendants based on the non-filing of those two tax returns, Defendants' motion to dismiss is DENIED as to those claims.

In his supplemental briefing opposing summary judgment, Plaintiff requested leave to file a Fourth Amended Complaint with the assistance of counsel.  (Pl. Supp. Br. 5 ("If the Court does determine that the TAC fails to adequately state a claim for constructive fraud, [Plaintiff] respectfully requests that the Court permit him to submit an amended complaint now that he has the assistance of counsel.")).  Precisely because "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party," *Burch* v. *Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (internal citation omitted), the Court will require Plaintiff to proffer his proposed arguments for a Fourth Amended Complaint before it resolves his request for leave to amend.  Accordingly, it is hereby ORDERED that the parties appear for a conference with the Court on **September 15, 2016, at 10:00 a.m.** in Courtroom 618 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  Plaintiff should be prepared to discuss any viable, non-time-barred claims that he would propose to bring in a Fourth Amended Complaint, if permitted by the Court, within the strictures of Federal Rule of Civil Procedure 11.

      SO ORDERED.

Dated:      August 10, 2016
              New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge