UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

KEVIN CARROLL ANDERSON,

Plaintiff,

v.

ARTHUR B. GREENE, ARTHUR B. GREENE
& COMPANY, P.C., and MARKS, PANETH &
SHRON LLP

Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __August 16, 2017_

14 Civ. 10249 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Last year, this Court issued a 75-page Opinion (the "August 2016 Opinion") dismissing most of Plaintiff Kevin Carroll Anderson's Third Amended Complaint. Defendants Arthur B. Greene ("Greene"), Arthur B. Greene & Company, P.C. ("ABG Co.," and with Greene, the "Greene Defendants"), and Marks, Paneth & Shron LLP ("MPS," and with the Greene Defendants, "Defendants") had argued that all of the Third Amended Complaint's claims were time-barred. With the exception of one of those claims — for breach of fiduciary duty, arising out of Greene and MPS's alleged failure to file Plaintiff's 2009 and 2010 tax returns — the Court agreed.

But the Court also offered Plaintiff an opportunity to move for leave to file a Fourth Amended Complaint. Plaintiff was proceeding *pro se* when he filed the Third Amended Complaint; he retained counsel while Defendants' motions

to dismiss were pending.  And it was the Court's hope that, with the aid of counsel, Plaintiff would be able to plead cognizable, *timely* causes of action.

That hope remains unfulfilled.  Pending before the Court is Plaintiff's motion for leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure.  Attached to Plaintiff's supporting brief is a proposed Fourth Amended Complaint.  In nearly every salient respect, it is less effective than Plaintiff's Third Amended Complaint.

Indeed, as the Court presaged during the October 11, 2016 pre-motion conference in this case, Plaintiff's Fourth Amended Complaint evokes the movie "Groundhog Day."  *See* GROUNDHOG DAY (Columbia Pictures 1993).  Put simply, Plaintiff has forgotten the past thirty-two months of litigation:  Plaintiff seeks to revivify claims that he withdrew, strategically, years earlier.  He attempts to advance new claims despite having no new factual allegations.  And, with one exception discussed further *infra*, Plaintiff acts as though the Court's August 2016 Opinion was never issued.  Plaintiff has not only failed to remedy the litany of pleading deficiencies identified by the Court, but he has in fact added to their number.  Accordingly, the Court denies his motion for leave to amend.

## BACKGROUND[1]

Plaintiff offers the Fourth Amended Complaint as a standalone pleading, but it does not read like one.  The language and paragraph structure of the

---

[1]     This Opinion draws on facts from Plaintiff's proposed Fourth Amended Complaint, which Plaintiff has titled the "Amended Complaint Under the Racketeer Influenced and Corrupt Organization Act" ("FAC" (Dkt. #113-1)).  It also cites to Plaintiff's Third Amended Complaint ("TAC" (Dkt. #58-1 to 58-2)), and the transcript of the October 11, 2016 pre-motion conference ("10/11/16 Tr." (Dkt. #116-11)).

Fourth Amended Complaint are very different from those of the Third Amended Complaint.  Unlike the Third Amended Complaint, the Fourth Amended Complaint names Richard Guttenberg as a defendant.[2]  And while the Third Amended Complaint brought two causes of action (breach of fiduciary duty and legal malpractice (*see* TAC ¶¶ 147-54)), the Fourth Amended Complaint brings five:  (i) a civil violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (ii) fraud, (iii) breach of contract, (iv) breach of fiduciary duty, and (v) conversion (*see* FAC ¶¶ 48-84).

But in spite of these differences, Plaintiff expects the Court to consider the Fourth Amended Complaint in tandem with the Third Amended Complaint, as well as numerous other documents and pleadings.[3]  So, for example, the

---

For ease of reference, the Court refers to Plaintiff's brief in support of his motion for leave to amend as "Pl. Br." (Dkt. #113); to the Greene Defendants' and MPS's opposition briefs as "Greene Br." (Dkt. #115) and "MPS Br." (Dkt. #117), respectively; and to Plaintiff's reply brief as "Pl. Reply." (Dkt. #118).

[2]    The Fourth Amended Complaint names (i) Greene, (ii) ABG Co., (iii) MPS, and (iv) Guttenberg as defendants.  (FAC 1).  But it is unclear if the term "Defendants," as Plaintiff uses it in the Fourth Amended Complaint, refers collectively to all four of these individuals and entities, or to one or more subsets of them.  That is because Plaintiff never defines the term "Defendants," but uses it throughout the Fourth Amended Complaint across decades of conduct.  (*See, e.g., id.* at ¶¶ 1, 3, 23).

To be clear, in this Opinion, the term "Defendants" refers to the three defendants Plaintiff named in the Third Amended Complaint, the operative complaint in this case: (i) Greene, (ii) ABG Co., and (iii) MPS.  Guttenberg is not a defendant in this action.

[3]    During a conference on October 11, 2016, the Court instructed Plaintiff's counsel *not* to adopt this approach:

> MS. KACHROO: ... [W]e seek some clarification with regard to breach of fiduciary duty because you have allowed two of the years, 2009, 2010, which is why your ruling is interlocutory; it's partially allowed.
>
> So we were wondering whether you want us to reinsert that into a fourth amended complaint or to proceed forward with that matter.
>
> THE COURT:  I'm not going to have us proceeding on two complaints at the same time.  If I were to permit amendment — and again, that's part of the reason why we're here this morning — it

Fourth Amended Complaint, which has no exhibits, quotes documents that the Court has been unable to locate even after diligently reviewing this case's docket. (*See* FAC ¶¶ 60-61). It cites repeatedly (and without pincites) to the Court's August 2016 Opinion for the general proposition that MPS and Greene failed to file Plaintiff's 2009 and 2010 tax returns — as though adverting to the Opinion could take the place of pleading the requisite factual allegations.[4] And it discusses alleged events — like "a chance encounter … in late 2010" that Plaintiff claims tipped him off to Defendants' wrongdoing — without explaining what those events were or when they occurred. (*Id.* at ¶ 20).

With these caveats in mind, the Court will consider the Fourth Amended Complaint, first by evaluating its factual allegations, then by reviewing its procedural history.

## A.    **Factual Background**

The thrust of the Fourth Amended Complaint is that Defendants and Guttenberg mismanaged and stole Plaintiff's money, then tried to cover their tracks. (*See, e.g.*, FAC ¶¶ 1-2, 8-9). Plaintiff, an actor, earned roughly $7

---

would include the two counts that were permitted after the last round of briefing.

(10/11/16 Tr. 5).

[4]    *See* FAC ¶ 30 n.2 ("By Opinion and Order dated August 10, 2016, the Court has already determined that [Plaintiff] had properly pled claims arising from MPS's and Greene's failure to file [Plaintiff's] 2009 and 2010 tax returns."); *id.* at ¶ 43 ("As determined by the Court in its August 10, 2016 Opinion and Order, the following allegations by Plaintiff pertaining to his 2009 and 2010 tax returns must be evaluated on their merits under Rule 12(b)(6)."); *id.* at ¶ 47 ("[A]s the Court found in its August 10, 2016 Opinion and Order, there is at a minimum a genuine issue of material fact regarding the parties' understanding of continuing work by Defendants MPS and Greene on Plaintiff's 2009 and 2010 tax returns, each of which may be deemed a 'particular transaction' governed by the doctrine of continuing representation.").

million between 1985 and 2012. (*Id.* at ¶ 1). Greene is an accountant and attorney who, from 1990 to 2009, owned ABG Co. (*Id.* at ¶ 8). In 2009, ABG Co. merged with MPS; after the merger, Plaintiff's "primary contact at [MPS] became [ ] Guttenberg." (*Id.*). For decades, Plaintiff "entrust[ed]" "his earnings" to these individuals and entities. (*Id.* at ¶ 1). And "[v]ery recently," Plaintiff claims, "he learned that almost all of his money was gone and could not be accounted for." (*Id.*).

Plaintiff first met Greene in 1985. (FAC ¶ 11). As depicted in the Fourth Amended Complaint, the young Midwesterner was enamored of Greene, an urbane New Yorker. (*Id.*). Between 1985 and 1990, Greene prepared Plaintiff's taxes. (*Id.* at ¶ 12). Sometime thereafter, Greene formed Joe Coyote Inc. ("JCI"), a corporation with a "Defined Contribution Pension Plan" designed to "benefit" Plaintiff. (*Id.* at ¶ 14). "Greene appointed himself Secretary and Treasurer of JCI and Trustee of" its pension plan; in those capacities, Greene exercised near-complete control over Plaintiff's finances. (*Id.*).

In November 1990, during a meeting at Greene's offices, Greene offered to provide Plaintiff "a range of financial, accounting[,] and legal services … in exchange for 5% of [Plaintiff's] income." (FAC ¶ 15). The Fourth Amended Complaint does not explain whether this meeting post- or predated JCI's formation. Greene memorialized the terms of his proposal in a letter he sent to Plaintiff on November 7. (*Id.*). And Greene "elaborated on his offer" during a December 4, 1990 meeting with Plaintiff. (*Id.* at ¶ 16). At that meeting,

Plaintiff contends, he accepted Greene's offer and "[a] binding oral contract was formed."  (*Id.* at ¶ 17).[5]

Here is where the Fourth Amended Complaint's timeline becomes difficult to follow.  Plaintiff alleges that Greene breached his oral contract with Plaintiff "numerous times over the years" following their December 4, 1990 meeting.  (FAC ¶ 19).  And Plaintiff also alleges that "[b]ecause of the particular nature of this contract, ... [Plaintiff] had no access or practical ability to detect Greene's breaches until many years later."  (*Id.*).  By Plaintiff's account, it was not "until a chance encounter ... in late 2010" that he began to suspect something was awry.  (*Id.* at ¶ 20).  Just what that "chance encounter" was — and even more importantly, just what conduct occurred between 1990 and 2010 — is not entirely clear.

Between 1990 and 2010, Plaintiff alleges, "Greene, ABG [ ] Co., and later MPS had total control over all of [Plaintiff's] banking and investment accounts." (FAC ¶ 20).  During this period, Greene, ABG Co., and MPS "actively concealed their fraudulent conduct and design so that [Plaintiff] was never aware of the active fraud being perpetrated on him."  (*Id.*).   And as part of this concealment, "until 2008" Plaintiff "was sent incomplete financial statements prepared by ABG [ ] Co. on a monthly and annual basis."  (*Id.* at ¶ 21).  Although Greene, ABG Co., and MPS allegedly used these statements to conceal their wrongdoing, Plaintiff also claims that these statements *exposed* that same

---

[5]    In the August 2016 Opinion, the Court rejected Plaintiff's argument that he entered into a binding contract with Greene during the December 4, 1990 meeting.  (August 2016 Opinion 49).  The amended pleading does not cause the Court to depart from that view.

wrongdoing: "[W]hen reviewed in a detailed fashion," Plaintiff alleges, the "face of the statements themselves" discloses "rampant forgery." (*Id.* at ¶ 31).

In any case, Plaintiff did not receive "actual bank account information" until he requested it "in late 2011." (FAC ¶ 21; *see also id.* at ¶¶ 30 ("[Plaintiff]] could never receive the statements he sought, until 2011 when he obtained a small number of incomplete bank statements from the Defendants."), 62 ("Defendants Greene and ABG [ ] Co. made personalized statements and never gave [Plaintiff] actual bank and financial statements from the source of the account[.]")). Perhaps after receiving this "actual bank account information," or perhaps before, Plaintiff spent "a year" "relentlessly" "hounding" Greene, ABG Co., and MPS. (*Id.* at ¶ 22). Only after this "hounding" did Plaintiff "discover[ ] the events and transactions from which [his] causes of action arise." (*Id.*).[6]

Plaintiff also alleges that "[d]uring the period from the arousal of his suspicions to [Plaintiff's] discovery of the fraud, … Greene and employees of [ ] MPS" offered Plaintiff "different and often contradictory accounts of [their] conduct … to explain the financial hardship [Plaintiff] was … experiencing." (FAC ¶ 23). Again, Plaintiff does not explain clearly when "his suspicions" were "arous[ed]," nor when he "discover[ed] the fraud."

---

[6]    While the Fourth Amended Complaint is strikingly, if not deliberately, evasive in its recounting of dates, one might intuit from other portions of the Fourth Amended Complaint that the period of "hounding" described in paragraph 22 ended in or about 2011. That, however, is the fundamental flaw in the pleading: The Fourth Amended Complaint was a counseled submission, and yet the Court has spent many hours attempting to piece together a timeline of relevant events — a timeline that, the Court hastens to add, was specifically requested by the Court to address its concerns that Plaintiff's claims were time-barred. Even now, and as detailed at various points in this Opinion, the Court has no confidence in the timeline it has pieced together.

Plaintiff does explain, however, that "[a]s recently as July 19, 2011, [ ] Greene assured [Plaintiff] that his taxes were filed for all years in dispute." (FAC ¶ 23). Plaintiff appears to allege that this representation was a lie, because Plaintiff eventually "realized that his bank accounts and monies had been garnished and levied by the IRS for failure to file tax returns." (*Id.* at ¶ 30). Here too, Plaintiff does not specify *when* he had this realization, although the Fourth Amended Complaint intimates that it was before 2011. (*Id.*). The Court also infers from Plaintiff's repeated citations to the August 2016 Opinion that Plaintiff is alleging that MPS and Greene failed to file his 2009 and 2010 tax returns (*see id.* at ¶¶ 30 n.2, 43, 47); there are, however, no factual allegations concerning this failure or Plaintiff's discovery thereof.

Defendants and Guttenberg also allegedly failed to manage Plaintiff's finances in an effective way. The "financial statements" Plaintiff received disclosed that "at no point were [Plaintiff's] earning[s] ever invested in any growth producing" vehicles. (FAC ¶ 25). "[E]ven [Plaintiff's] $650,000 of savings from 1990 disappeared." (*Id.* at ¶ 24). Plaintiff "trusted that his attorney/accountant/financial and business manager would faithfully grow and account for his investments." (*Id.* at ¶ 26). But Plaintiff alleges that his trust was misplaced, because Greene and "Guttenberg conspired together and with others through a course and pattern of unlawful racketeering to conceal their activities" and enrich themselves. (*Id.*). The unlawful conduct Greene and Guttenberg allegedly orchestrated included "a treasury bill racket" and "forging [Plaintiff's] signature on key documents." (*Id.*).

These "racketeering activities," Plaintiff alleges, were the handiwork of the "ABG Criminal Syndicate," "a coordinated enterprise of corporate and individual associates" that included Guttenberg "and employees at ABG [ ] Co. ... and subsequently MPS." (FAC ¶ 27; *see also id.* at ¶ 31 (referring to this network as the "ABG Criminal Enterprise")). It is unclear who the other "corporate and individual associates" of the ABG Criminal Syndicate were; Plaintiff alleges that "some of the players and schemes have changed" over time. (*Id.* at ¶ 28). The period of time over which the enterprise operated is also unclear. (*Compare id.* at ¶ 20 ("Defendants Greene, ABG [ ] Co., and later MPS had total control over all of [Plaintiff's] banking and investment accounts from 1990 to 2012."), *with id.* at ¶ 28 ("[T]he ABG Criminal Syndicate has continued its activities to the present[.]")). What is clear is Plaintiff's allegation that Greene helmed the ABG Criminal Syndicate, and "engineered" its "schemes" "to produce substantial profits from legal and illegal racketeering activities." (*Id.* at ¶ 27). These "schemes," Plaintiff alleges, "includ[e] mail and wire fraud, bank fraud, embezzlement, securities fraud, breach of contract, and malpractice." (*Id.*).

Plaintiff further alleges that, even without the benefit of discovery, he has learned that the breadth of the ABG Criminal Syndicate's "fraud and embezzlement ... is startling." (FAC ¶ 31). Plaintiff has seen "[bank] documents and forms [that were] tampered with." (*Id.*). And as the Court discussed *supra*, "the statements" ABG Co. provided Plaintiff through 2008 also reveal "rampant forgery ... on the[ir] face." (*Id.* at ¶¶ 21, 31). For example,

"[o]n the May 2004 [s]tatement a $200,000 [Treasury Bill] is devalued … to $139,000 before being redeemed." (*Id.* at ¶ 31). These discrepancies, Plaintiff claims, "constitute[ ] prima facie forgery if the [Treasury Bills] deposited were purchased for different values." (*Id.*).

Plaintiff has also discovered similar improprieties concerning Certificates of Deposit purchased between "at least April 1999[ ] until at least January 2007." (FAC ¶ 35). Plaintiff does not explain how or when he made this discovery. He does allege that "[a]ccount statements show[ ]" "two curious outliers" in the Certificates of Deposit that Defendants purchased (*id.* at ¶¶ 35, 39); the Court assumes that these "[a]ccount statements" are the "monthly and annual" statements Plaintiff received from ABG Co. through 2008 (*see id.* at ¶ 21). First, these statements show a Certificate of Deposit purchased "for $50,000 in January 2002, … which was sold in January 2005 for $75,595". (*Id.* at ¶ 35). Second, these statements show a Certificate of Deposit purchased "for $42,000 in April 2005, … which was sold in July 2005 for $138,894." (*Id.*). Plaintiff suggests that Defendants "misreport[ed] the earnings" from these two Certificates of Deposit in order "to cover-up their past misconduct." (*Id.*). Thus, Plaintiff alleges, Defendants' "[a]ccount statements … created a perfect opportunity for Defendants to take funds as they pleased for their own use." (*Id.* at ¶ 39).

In further support of his civil RICO claim, Plaintiff alleges that Defendants and Guttenberg committed several other acts of bank, mail, and wire fraud. (FAC ¶ 52). These allegations include:

- "On May 21, 2014 at around 9:00 A.M., Peggy Anderson, landlord for the property 39 Spring Street, New York, New York 10012, states that the signature on Check 7126 was not her signature." (FAC ¶ 52). The Fourth Amended Complaint gives no indication of whether Plaintiff ever lived at 39 Spring Street. Nor does it explain the reason for which "Check 7126" was tendered. Plaintiff adds: "Upon review of the signature, and comparison to signatures known to be [ ] Guttenberg's, a striking similarity was found." (*Id.*).

- "In the winter of 2009, [ ] Guttenberg forged [Plaintiff's] signature on an IRS corporate tax document, signing as President of JCI on an IRS corporate tax document. [ ] Guttenberg has never been the President of JCI or held any other executive positions. This practice of forging corporate tax documents has been repeated throughout the duration of the criminal enterprise, as is stated by MPS employee Anita Asmah in her e[-]mail to [Plaintiff] dated May 2, 2011." (FAC ¶ 52). This e-mail is neither quoted in, nor attached to, the Fourth Amended Complaint. It was, however, attached as "Exhibit E" to an affidavit Plaintiff submitted in opposition to Defendants' motions to dismiss the Third Amended Complaint. (*See* Dkt. #87-5).

- "Upon information and belief, [ ] Greene used interstate wires in a telephone conversation with [ ] Guttenberg, to plan and execute a false and fraudulent 'T-bill' scheme to embezzle money through JCI." (FAC ¶ 52). The Fourth Amended Complaint reveals neither the date, nor the substance, of this telephone call.

On an unspecified date, Plaintiff filed a "bar complaint" against Greene. (FAC ¶ 41; *see also id.* at ¶ 10). In response, Greene "refuse[d] to acknowledge any of [Plaintiff's] real grievances about the disappearance of all of his money and savings." (*Id.* at ¶ 41). "Instead, Greene ... rest[ed] on his '50 years' representing celebrities as evidence that he is honest and that he properly managed [Plaintiff's] funds and companies" — a page, Plaintiff claims, taken

from the playbook of "disgraced felon Bernie Madoff." (*Id.*; *see also id.* at ¶ 62 (noting parenthetically that ABG's practice of submitting individualized account statements was "also carried out by disgraced hedge fund manager, and convicted felon, Bernard Madoff")).

In sum, Plaintiff alleges that "the ABG Criminal Syndicate never made any investments with [Plaintiff's] money." (FAC ¶ 52). Instead, the members of this enterprise "defrauded" Plaintiff "out of millions of dollars he had earned and believed would be increasing his nest egg for retirement." (*Id.* at ¶ 55).

## B.    Procedural Background

The August 2016 Opinion sets forth this case's procedural history in detail. (August 2016 Opinion 19-22). Here, the Court will catalog the five iterations of Plaintiff's complaint — and consider how Plaintiff's causes of actions have evolved, Hydra-like, from this case's inception through the present:

*Complaint*: Plaintiff, then *pro se*, filed his initial Complaint on December 31, 2014. (Dkt. #1). He named one defendant: Greene. (*Id.*). The Complaint brought six causes of action: (i) breach of fiduciary duties; (ii) breach of contract; (iii) legal malpractice; (iv) embezzlement; (v) fraud; and (vi) civil RICO. (*Id.* at 4-27).

*Amended Complaint*: Three weeks later, on January 21, 2015, Plaintiff filed his Amended Complaint. (Dkt. #3). The Amended Complaint added two new defendants — ABG Co. and MPS — but retained the Complaint's six causes of action. (*Id.* at 1, 5).

*Second Amended Complaint*:  Plaintiff amended his complaint again on June 29, 2015, in order to address issues that had arisen during a June 3, 2015 pre-motion conference held in contemplation of defense motions to dismiss.  (Dkt. #30; *see also* Dkt. #27).  In his Second Amended Complaint, Plaintiff limited his causes of action to two:  (i) breach of fiduciary duties and (ii) legal malpractice.  (Dkt. #30, at 5).  And Plaintiff added ten "Doe" defendants, each of whom, Plaintiff alleged, was "in some manner responsible for the actions, damages, and injuries" set forth in the Second Amended Complaint.  (*Id.* at 6-7).

*Third Amended Complaint*:  On October 20, 2015 — while Defendants' motions to dismiss Plaintiff's Second Amended Complaint were pending (*see* Dkt. #39-48) — Plaintiff filed his Third Amended Complaint (Dkt. #58-1 to 58-2).  Like the Second Amended Complaint, Plaintiff's Third Amended Complaint named Greene, ABG Co., MPS, and "Does 1 through 10" as defendants.  (*Id.* at 1).  The Third Amended Complaint augmented slightly the Second Amended Complaint's breach of fiduciary duties claim:  Plaintiff clarified that he was seeking relief for Defendants' "breach of fiduciary duty *based on constructive fraud.*"  (*Id.* at 41-42 (emphasis added and alterations omitted)).[7]

The Third Amended Complaint was the subject of the August 2016 Opinion.  (August 2016 Opinion 1).  There, the Court concluded that "all of" the

---

[7]    This amendment, too, was strategic, as the Court observed:  "Plaintiff's constructive fraud claims are a thinly-disguised effort to circumvent the limitations period for his fiduciary duty claims, as revealed by the evolution of his pleadings in this case." (August 2016 Opinion 37).

Third Amended Complaint's "claims [were] time-barred, with the exception of [its] claims relating to Defendants' failure to file [Plaintiff's] 2009 and 2010 tax returns." (*Id.* at 29).

*Fourth Amended Complaint*: Finally, on November 23, 2016, Plaintiff filed his proposed Fourth Amended Complaint. (Dkt. #113-1). In it, Plaintiff resurrected three causes of action that appeared in his Complaint and Amended Complaint, but not in his Second or Third Amended Complaints: civil RICO, fraud, and breach of contract. (FAC ¶¶ 48-68). And Plaintiff added one new cause of action: conversion. (*Id.* at ¶¶ 79-84). The Fourth Amended Complaint was the first complaint that Plaintiff filed through counsel.

* * *

Plaintiff filed his motion for leave to amend and a supporting brief on November 23, 2016, the same day he tendered his Fourth Amended Complaint. (Dkt. #112-13). The Greene Defendants and MPS filed separate opposition briefs on December 16, 2016 (Dkt. #115, 117), and briefing concluded when Plaintiff submitted his reply brief on December 30, 2016 (Dkt. #118).

## DISCUSSION

The crux of the August 2016 Opinion was that most of the Third Amended Complaint's claims were time-barred. The events giving rise to Plaintiff's suit began in 1985 — nearly three decades before Plaintiff filed his initial Complaint. And as the Court explained at length in the August 2016 Opinion, the balance of those events occurred so long ago that they likely could not support timely causes of action.

14

Given the August 2016 Opinion's analytic focus, the Court was surprised to see that most of the Fourth Amended Complaint's allegations lack dates. Indeed, the Court is left to wonder whether Plaintiff addressed the Court's timeliness concerns by eliding, if not disregarding, the inclusion of specific dates in his post-Opinion pleading. Along similar lines, Plaintiff's brief in support of his motion for leave to amend barely attempts to explain why the Fourth Amended Complaint's claims are timely. And because the Fourth Amended Complaint's narrative of allegations is non-linear and disjointed, the Court is *more* concerned, not less, that Plaintiff's claims are time-barred. Defendants contend that Plaintiff's counsel has run afoul of Rule 11 by tendering the Fourth Amended Complaint. (Greene Br. 1-2; MPS Br. 2-3). Their argument is not hyperbole.

All this should make plain that Plaintiff's motion for leave to file his Fourth Amended Complaint fails. Every relevant factor under Rule 15 militates in favor of denying that motion and requiring Plaintiff to stand on his Third Amended Complaint. For the reasons set forth below, the Court will do just that.

## A. Applicable Law

"Rule 15(a)(2) allows a party to amend its pleading with the court's leave, which should be 'freely give[n] ... when justice so requires.'" *F5 Capital* v. *Pappas*, 856 F.3d 61, 88-89 (2d Cir. 2017) (quoting Fed. R. Civ. P. 15(a)(2)). The Rule's standard is a "permissive" one that embodies a "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells*

*Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Williams* v. *Citigroup Inc.,* 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)).

But Rule 15(a)(2)'s permissive standard has limits. "Leave to amend, though liberally granted, may properly be denied for" a number of reasons, including: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Temple* v. *Hudson View Owners Corp.*, 222 F. Supp. 3d 318, 325 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Ruotolo* v. *City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008)); *accord Loreley*, 797 F.3d at 190. The Court will elaborate on these grounds for denying leave to amend *infra*. Here, the Court notes that "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the non[-]movant of prejudice or bad faith." *Hutter* v. *Countrywide Bank, N.A.*, 41 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) (quoting *AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.,* 626 F.3d 699, 725 (2d Cir. 2010)).

## B.    Analysis

The Greene Defendants and MPS make similar arguments in their opposition briefs. They argue that allowing Plaintiff to file the Fourth Amended Complaint would be futile, because none of its claims is cognizable. (Greene Br. 7-12; MPS Br. 4-12). They argue that Plaintiff has, once again, failed to cure the deficiencies of his previous complaints. (Greene Br. 12-14; MPS

16

Br. 12-13).  And they argue that granting Plaintiff leave to amend would work prejudice against them.  (Greene Br. 14-17; MPS Br. 13-14).  MPS adds that Plaintiff unduly delayed moving to file the Fourth Amended Complaint.  (MPS Br. 14-15).

The Court agrees with all of these arguments.  The Court does not believe, and Defendants do not argue, that Plaintiff filed the Fourth Amended Complaint in bad faith.  But every other relevant Rule 15(a)(2) factor — futility, failure to cure prior deficiencies, prejudice, and undue delay — cuts against Plaintiff.  The Court addresses each of those factors in turn.

## 1.    Plaintiff's Proposed Amendments Are Futile

"A proposed amendment to a complaint is futile when it could not withstand a motion to dismiss."  *Pappas*, 856 F.3d at 89 (quoting *Balintulo* v. *Ford Motor Co.*, 796 F.3d 160, 164-65 (2d Cir. 2015)).  "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a [Rule 12(b)(6)] motion to dismiss."  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).

This standard is well-settled.  "As when considering a motion to dismiss under Rule 12(b)(6), [a] court" considering a motion for leave to amend "must accept as true all well-pleaded facts" in a plaintiff's proposed amended complaint "and draw all reasonable inferences in the [plaintiff's] favor."  *Artists Rights Enf't Corp.* v. *Estate of King*, No. 16 Civ. 1121 (JPO), 2017 WL 2062988, at *3 (S.D.N.Y. May 15, 2017) (internal quotation marks omitted) (quoting

17

*Agerbrink* v. *Model Serv. LLC*, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016)).

Under this standard, "an amendment is futile if the claim proposed to be added would be barred by the applicable statute of limitations." *Neal* v. *Wilson*, No. 15 Civ. 2822 (GWG), — F. Supp. 3d —, 2017 WL 933229, at *2 (S.D.N.Y. Mar. 9, 2017). "The party opposing a motion to amend bears the burden of establishing that an amendment would be futile[.]" *Waterford Twp. Police & Fire Ret. Sys.* v. *Reg'l Mgmt. Corp.*, No. 14 Civ. 3876 (LTS), 2017 WL 395206, at *1 (S.D.N.Y. Jan. 27, 2017) (internal quotation mark and citation omitted).

Defendants have met this burden: None of the Fourth Amended Complaint's claims could withstand a Rule 12(b)(6) motion to dismiss. The Fourth Amended Complaint is filled with gaps. Instead of presenting a coherent timeline of alleged events, it alludes vaguely to allegations Plaintiff made in prior pleadings, conclusions the Court reached in the August 2016 Opinion, and various extrinsic documents (only some of which the Court has been able to locate). But when a court adjudicates a Rule 12(b)(6) motion, it "[g]enerally ... do[es] not look beyond 'facts stated on the face of the complaint, ... documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken.'" *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P.* v. *Entm't Props. Tr.,* 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *see also id.* ("We have recognized, however, that in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to

dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" (quoting *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))). Plaintiff ignored this restriction. As a result, the Fourth Amended Complaint is so confusingly written that its claims are not merely implausible, but nearly incomprehensible.

Below, the Court will explain why the Fourth Amended Complaint's five counts — (i) civil RICO, (ii) fraud, (iii) breach of contract, (iv) breach of fiduciary duty, and (v) conversion — are futile. And in keeping with its analysis in the August 2016 Opinion, the Court will focus on one universal defect in those five counts: Even assuming that all five relate back to Plaintiff's December 31, 2014 Complaint, they are untimely.

### a.  Count One:  Civil RICO

"The limitations period for a civil RICO action is four years." *Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331, 348 (S.D.N.Y. 2015) (citing *Agency Holding Corp.* v. *Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156-57 (1987)). Determining when that limitations period begins to run requires two steps. "The first step in the statute of limitations analysis is to determine when the plaintiff sustained the alleged injury for which [he] seeks redress." *Bus. Watchdog* v. *ITEX Corp.*, No. 13 Civ. 6794 (CM), 2014 WL 5525718, at *10 (S.D.N.Y. Oct. 29, 2014). "The second step is to determine when the plaintiff discovered or should have discovered that injury. The four-year statute of limitations begins to run at that time." *Id.*; *see also Elsevier*, 77 F. Supp. 3d at 348 ("Where, as here, a RICO claim is based on allegations of fraud, the

limitations period begins when plaintiff is placed on notice of facts which should arouse suspicion." (quoting *Madison 92nd St. Assocs., LLC* v. *Courtyard Mgmt. Corp.,* No. 13 Civ. 3921 (CM), 2014 WL 3739322, at *11 (S.D.N.Y. July 29, 2014))). To this second step, "on a motion to dismiss, unless [d]efendants can produce uncontroverted evidence that irrefutably demonstrates when [p]laintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law." *Elsevier,* 77 F. Supp. 3d at 348-49 (quoting *Lapin* v. *Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006)).

Like all five claims Plaintiff brings in the Fourth Amended Complaint, his civil RICO claim gives no indication of when it accrued. And in turn, it is difficult to ascertain when the four-year statute of limitations for Plaintiff's civil RICO claim began to run.

But in any case, Defendants have clearly demonstrated that Plaintiff's civil RICO claim must have accrued before December 31, 2010 (i.e., four years before he filed his initial Complaint). As MPS notes, the Fourth Amended Complaint alleges a single predicate act that occurred after that date:

> On May 21, 2014 at around 9:00 A.M., Peggy Anderson, landlord for the property 39 Spring Street, New York, New York 10012, state[d] that the signature on Check 7126 was not her signature. Upon review of the signature, and comparison to signatures known to be [ ] Guttenberg's, a striking similarity was found.

(FAC ¶ 52). The Fourth Amendment does not explain who Peggy Anderson is, what connection she has to Plaintiff, nor why 39 Spring Street has any

relevance to this case. Consequently, the Court is at a loss to understand how this allegation supports Plaintiff's civil RICO claim.[8]

Plaintiff has repeatedly suggested that Defendants kept him in the dark about their misconduct. But even on his theory of events, Plaintiff was on "inquiry notice" of Defendants' fraud more than four years before he brought suit. "[O]n a monthly and annual basis until 2008" — six years before Plaintiff filed his initial Complaint — Plaintiff received "incomplete financial statements prepared by ABG [ ] Co." (FAC ¶ 21). These "statements," Plaintiff alleges, were a centerpiece of Defendants' fraud and their concealment of it:

> Account statements showing short sales of [Treasury Bills], and the outlier [Certificate of Deposit] sales ... , created a perfect opportunity for Defendants to take funds as they pleased for their own use without payment of any interest or other opportunity cost to [Plaintiff], and return funds as they felt fearful of facing the consequences of their actions. This need to conceal their criminal enterprise also explains Defendants' forgery of [Treasury Bills], and financial documents[.]

(*Id.* at ¶ 39).

---

[8] MPS offers a different take on this issue. Citing to the August 2016 Opinion, MPS argues that the allegation about Check 7126 "must relate to the periods plaintiff was a tenant" at 39 Spring Street, "which were January to June 1999 and September 2003 to June 2004." (MPS Br. 12 n.1 (citing August 2016 Opinion 47-48)). Thus, MPS contends, "this alleged predicate act ... is long time-barred." (*Id.*). Maybe so. But to determine whether Plaintiff's civil RICO claim is timely, the Court is largely restricted to the text of the Fourth Amended Complaint and whatever materials may properly be considered in light of cases like *Goel.* As the Court has explained, the Fourth Amended Complaint's allegation about Check 7126 is presented without any context. Given the relevant law and the current pleading, the Court believes it is preferable to conclude that this allegation cannot save Plaintiff's civil RICO claim because it has no apparent relevance to that claim, rather than because consideration of other materials makes plain that the allegation is time-barred.

But Plaintiff also alleges that "rampant forgery exists even on the face of the statements themselves when [they are] reviewed in a detailed fashion." (FAC ¶ 31). That is a powerful concession. As Defendants note, "[t]hese statements … showed, at the time that [Plaintiff] received them, the bases for what [Plaintiff] now claims to be fraud[.]" (Greene Br. 9; *accord* MPS Br. 12). Put another way: By Plaintiff's account, through 2008 he received periodic reminders that Defendants were defrauding him. Defendants have thus "produce[d] uncontroverted evidence" — Plaintiff's own words — "that irrefutably demonstrates" that Plaintiff should have discovered Defendants' alleged scheme long before December 31, 2010. *Elsevier*, 77 F. Supp. 3d at 348-49 (quoting *Lapin*, 506 F. Supp. 2d at 234). Viewed from every angle, the Fourth Amended Complaint's civil RICO claim is untimely.[9]

---

[9] Plaintiff suggests that misrepresentations and omissions in these financial "statements" did not become apparent to him until later, but takes pains to remain imprecise as to how much later. In the Fourth Amended Complaint, Plaintiff begins by noting that only "[v]ery recently, he learned that almost all of his money was gone and could not be accounted for by the Defendants." (FAC ¶ 1). Given the date of the Fourth Amended Complaint, and the years of litigation that ensued prior to its filing, that statement is certainly inaccurate. More to the point, the Court will *not* accept a nebulous description such as "very recently" as a factual basis for avoiding a time bar. Similarly, Plaintiff notes that "[i]t was not until after a year of hounding Defendants Greene, ABG [ ] Co., and MPS relentlessly that [Plaintiff] discovered the events and transactions from which these causes of action arise" (*id.* at ¶ 22), but does not specify the relevant time period of this hounding. (*See also id.* at ¶ 23 (referring to, but not defining, "the period from the arousal of his suspicions to [Plaintiff's] discovery of the fraud"); *cf. id.* at ¶ 20 (referring, without explaining, to "a chance encounter [that] began to arouse his suspicions in late 2010")). Cobbling these allegations together, at the very latest Plaintiff was aware of sufficient facts to be on inquiry notice in 2010 (when he had his "chance encounter"). And there is nothing in the Fourth Amended Complaint to suggest that that awareness materialized only on *December 31*, 2010.

### b.     Count Two:  Fraud

"Under New York law, the statute of limitations for fraud is the greater of [i] six years from the time of accrual or [ii] two years from the time the plaintiff discovered the fraud or could with reasonable diligence have discovered it." *Soward* v. *Deutsche Bank AG*, 814 F. Supp. 2d 272, 279 (S.D.N.Y. 2011) (citing N.Y. C.P.L.R. § 213(8)).  Under this first, six-year limitation period, a claim for fraud "accrues as soon as 'the claim becomes enforceable, i.e., when all elements of the [claim] can be truthfully alleged in a complaint.'"  *Sejin Precision Indus. Co.* v. *Citibank, N.A.*, — F. Supp. 3d —, No. 16 Civ. 6910 (JSR), 2016 WL 9224991, at *3 (S.D.N.Y. Jan. 20, 2016) (quoting *IDT Corp.* v. *Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 140 (2009)).  In New York, "fraud requires proof of" five elements:  "[i] a material misrepresentation or omission of a fact, [ii] knowledge of that fact's falsity, [iii] an intent to induce reliance, [iv] justifiable reliance by the plaintiff, and [v] damages."  *Loreley*, 797 F.3d at 170.

The alternate, two-year statute of limitations for a fraud claim is a product of New York's "discovery rule."  *Sejin Precision*, 2016 WL 9224991, at *4.  It turns on an "objective" test:

> Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.

*Id.* (quoting *Gutkin* v. *Siegal*, 926 N.Y.S.2d 485, 486 (1st Dep't 2011)).

After reviewing Plaintiff's allegations of fraud, the Court concludes that each implicates a duty of inquiry, and thus that the two-year statute of limitations applies.  Only three of the allegations Plaintiff makes in support of his fraud claim have dates, and all three are time-barred:

*First*:  "On November 11, 1990, [ ] Greene falsely claimed that he had engaged in legitimate trades and was investing [Plaintiff's] money."  (FAC ¶ 59).  Greene made this alleged statement *24 years* before Plaintiff brought suit.  And as the Court discussed *supra*, Plaintiff concedes that the "personalized statements" he received through 2008 disclosed that Greene was actively defrauding him.  In other words, Plaintiff should have been on notice of Defendants' fraudulent investment scheme more than two years before Plaintiff filed the Complaint.

*Second*:  "Greene also falsely claimed '[i]f the IRS had not received returns for 2006 thru 2008, [Plaintiff] would be in collection for those years.  We have received no collection notices for those years and we believe the returns have been filed.'"  (FAC ¶ 60).  This allegation appears to quote from a July 26, 2011 e-mail; the Court assumes that Greene authored the e-mail.  (*Id*.).  Although this allegation is presented without context, the Court also assumes that this e-mail relates to Plaintiff's claim that Defendants failed to file his taxes.  To continue this train of assumptions, the Court intuits that Plaintiff alleges that Greene did not file Plaintiff's taxes between 2006 and 2008.  Thus, Plaintiff appears to allege that the representation Greene made in the July 26, 2011 e-mail was false.

By Plaintiff's account, sometime before 2011 he "realized that his bank accounts and monies had been garnished and levied by the IRS for failure to file tax returns." (FAC ¶ 30). In 2011, after Plaintiff "pleaded with [ ] Defendants to provide a full record of all bank statements ... [Plaintiff] obtained a small number of incomplete bank statements from [ ] Defendants." (*Id.*). Although this timeline of events is hazy, it makes clear that in 2011, Plaintiff knew that Defendants had failed to file his taxes. That means that during 2011, Plaintiff would have (or should have) known that the representation Greene made in his July 26, 2011 e-mail was false. And because Plaintiff knew (or should have known) that that representation was false more than two years before he filed his Complaint, Plaintiff's fraud claim is time-barred to the extent that it relies on that representation.

*Third*: "Greene stated false statements to [Plaintiff], such as 'refunds are never lost nor do they expire,' 'there is no statute of limitations,' and that '[MPS is] refiling simply as a precaution.'" (FAC ¶ 61). This allegation appears to quote from a July 19, 2011 e-mail; here too, the Court assumes that Greene wrote that e-mail. (*Id.*). And this allegation also appears to relate to the tax return issue the Court just addressed — an issue Plaintiff was aware of more than two years before he filed his Complaint.

Apart from the timeliness problems, none of Plaintiff's allegations lends plausible support to his fraud claim. Indeed, MPS's arguments under Federal Rule of Civil Procedure 9(b) have significant traction. (*See* MPS Br. 8-9). But even if Plaintiff's allegations rendered his fraud claim plausible, those

allegations concern events that happened many years before Plaintiff allegedly learned, or should have learned, that Defendants defrauded him. Plaintiff's fraud claim is thus time-barred.

### c. Count Three: Breach of Contract

"In New York, an action for breach of contract has a six-year statute of limitations." *NEM Re Receivables, LLC* v. *Fortress Re, Inc.*, 173 F. Supp. 3d 1, 8 (S.D.N.Y.) (citing N.Y. C.P.L.R. § 213(2)), *reconsideration denied*, 187 F. Supp. 3d 390 (S.D.N.Y. 2016). "The statute of limitations begins to run when the party making the claim 'possesses a legal right to demand payment.'" *Id.* (quoting *Hahn Auto. Warehouse, Inc.* v. *Am. Zurich Ins. Co.,* 18 N.Y.3d 765, 770 (2012)). Defendants contend that the statute of limitations for Plaintiff's contract claim is three years, not six, "because it is based upon the alleged negligent performance of the Greene Defendants' professional duties." (Greene Br. 8; *accord* MPS Br. 8). While the Court believes that Defendants have the better of this argument, the distinction is not material, because the Fourth Amended Complaint gives no sense of when Plaintiff's contract claim accrued.

Plaintiff alleges that he entered into a contract with Greene in 1990, and that pursuant to this contract Greene promised "to provide a full spectrum of services to Plaintiff." (FAC ¶ 65). And Plaintiff alleges that "Defendants breached their contract with Plaintiff in multiple ways." (*Id.* at ¶ 66). Defendants, Plaintiff alleges, did "not attend to the needs of their client"; "violated every shred of trust that was provided to them in good faith"; and "took unadulterated advantage of position, power and trust to betray [ ] Plaintiff

in a formidable and devastating manner." (*Id.*).  But the alleged sequence of events leading up to the proffered formation of the contract is precisely the sequence that was rejected previously by the Court in the August 2016 Opinion (*see supra* n.5), and the new pleading adds no facts to render this putative formation date any more plausible.  As such, the date of, parties to, and terms of a cognizable contract are not discerned from the Fourth Amended Complaint.

Putting that to the side, Plaintiff's allegations also leave an important question unanswered:  When did Defendants *breach* their contract with Plaintiff?  Perhaps it was 1995, when Greene allegedly engineered a fraudulent transaction with a Treasury Bill.  (FAC ¶ 52).  Perhaps it was 2004, when Greene repeated this act.  (*Id.*).  Or perhaps it was 2005, when Plaintiff claims that Defendants purchased a Certificate of Deposit and then "misreport[ed] [its] earnings." (*Id.* at ¶ 35).  At least one thing is clear:  The Fourth Amended Complaint does not allege a single event predating December 31, 2008 (i.e., six years before Plaintiff brought suit) that lends plausible support to Plaintiff's contract claim.  The claim is time-barred.

### d.    Count Four:  Breach of Fiduciary Duty

The August 2016 Opinion dedicated 27 pages to addressing the timeliness of the Third Amended Complaint's breach of fiduciary duty claim. (August 2016 Opinion 35-62).  The Court explained why that claim was subject to a three-year, not six-year, statute of limitations under New York law.  (*Id.* at 35-42).  Two parts of that limitations analysis bear mention here.  First, the

27

Court rejected Plaintiff's argument that, because "his fiduciary duty claims sound[ed] in constructive fraud," a six-year statute of limitations applied. (*Id.* at 36-38). The Court reasoned that any fraud alleged in the Third Amended Complaint was merely "incidental" to Plaintiff's fiduciary duty claim, and thus that Plaintiff was required to satisfy a three-year statute of limitations. (*Id.* (citations omitted)). Second, the Court explained that a three-year statute of limitations governed because Plaintiff "primarily" sought monetary damages instead of equitable relief. (*Id.* at 38-42). And the Court ultimately concluded that part of Plaintiff's breach of fiduciary duty claim — Plaintiff's allegation that MPS and Greene did not file his 2009 and 2010 tax returns — was timely and adequately pled. (*Id.* at 56-62).

The Fourth Amended Complaint's breach of fiduciary duty claim fares worse, again because Plaintiff fails to take heed of the August 2016 Opinion. In the Fourth Amended Complaint, Plaintiff cites New York cases discussing (i) the elements of a fiduciary duty claim and (ii) the statute of limitations for such a claim. (FAC ¶¶ 70-72, 76-77). Plaintiff reads these cases as confirming that his breach of fiduciary duty claim is subject to a six-year statute of limitations, because it "involves actual fraud." (*Id.* at ¶ 78). Plaintiff is mistaken. Nothing in the Fourth Amended Complaint changes the Court's conclusion in the August 2016 Opinion that a three-year statute of limitations governs. Plaintiff still requests damages, and he still fails to explain why Defendants' alleged fraud is more than incidental to his fiduciary duty claim.

Plaintiff's conclusory assertion that a six-year statute of limitations governs is not persuasive.

And in any case, the Fourth Amended Complaint does not explain *when* Plaintiff's breach of fiduciary duty claim accrued. In his brief, Plaintiff argues that the "Fourth Amended Complaint" expands on the Third Amended Complaint and "adds additional instances of breach." (Pl. Br. 9). Not so. To the contrary, the Fourth Amended Complaint cites just one example of such a breach: Plaintiff alleges that "Defendants' forgery and embezzlement," combined with their mismanagement of Plaintiff's money, violated Defendants' "fiduciary and ethical responsibilities to [Plaintiff]." (FAC ¶ 75).

Plaintiff does not clarify when Defendants committed this "forgery and embezzlement." The Fourth Amended Complaint's latest-in-time allegation of forgery is that "[i]n the winter of 2009, [ ] Guttenberg forged [Plaintiff's] signature on an IRS corporate tax document." (*Id.* at ¶ 52). That incident occurred five years before Plaintiff filed his initial Complaint — well outside of the three-year statute of limitations for Plaintiff's breach of fiduciary duty claim. Thus, Plaintiff's breach of fiduciary duty claim has taken a step backward: As pled in the Fourth Amended Complaint, no part of that claim is timely.

### e.    Count Five:  Conversion

Plaintiff's fifth and final cause of action, for conversion, is also time-barred. "New York's statute of limitations for conversion claims is three years, N.Y. C.P.L.R. § 214(3), and accrues at the time of conversion regardless of a

29

plaintiff's knowledge of the conversion." *Keep on Kicking Music, Ltd.* v. *Hibbert*, No. 15 Civ. 7464 (WHP), 2016 WL 4386047, at *5 (S.D.N.Y. Aug. 17, 2016) (quoting *United Teamster Fund* v. *MagnaCare Admin. Servs.*, LLC, 39 F. Supp. 3d 461, 478 (S.D.N.Y. 2014)).

Plaintiff alleges that Defendants converted "negotiable instruments," which they then "refused to return" to Plaintiff. (FAC ¶ 83). He also alleges that "Defendants forged Plaintiff[']s signature on bank documents," then "interfered to the exclusion of [Plaintiff] by robbing him of the possessory and time value of his money." (*Id.* at ¶ 82). Here again, the Fourth Amended Complaint gives no sense of when Defendants committed these acts. Nor does the Fourth Amended Complaint suggest that these events occurred within three years of the date Plaintiff filed his Complaint. And other than the Fourth Amended Complaint's allegation about Peggy Anderson (*id.* at ¶ 52), there is not a single allegation concerning an event that post-dates December 31, 2011. Plaintiff's conversion claim is thus untimely.

In sum, all five of the Fourth Amended Complaint's counts are time-barred. Allowing Plaintiff to file the Fourth Amended Complaint would thus be futile.

### 2. Plaintiff Has Failed to Cure the Deficiencies of His Prior Pleadings

The foregoing futility analysis should make plain that the Fourth Amended Complaint does not cure the principal deficiency identified in the August 2016 Opinion. To the contrary, the Fourth Amended Complaint *adds* four new untimely claims. "Plaintiff's failure to fix [the] deficiencies in" his

Third Amended Complaint, "after being provided notice of them, is alone sufficient ground to deny leave to amend." *Bautista* v. *CytoSport, Inc.*, 223 F. Supp. 3d 182, 194 (S.D.N.Y. 2016). That logic applies with even greater force here, where the deficiencies of the Third Amended Complaint have expanded to several new causes of action in the Fourth Amended Complaint.

The Court recognizes that Rule 15(a)(2) compels district courts to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But "justice does not require [that] a plaintiff be permitted to amend when, being 'on the plainest notice of what was required,' he fails to correct the deficiencies in a prior pleading." *Coal. for a Level Playing Field, L.L.C.* v. *Autozone, Inc.*, 813 F. Supp. 2d 557, 565 (S.D.N.Y. 2011) (quoting *Denny* v. *Barber,* 576 F.2d 465, 471 (2d Cir. 1978)). Just so here. The Fourth Amended Complaint aggravates the timeliness issues the Court identified in Plaintiff's Third Amended Complaint. That militates in favor of denying Plaintiff's motion for leave to amend.

### 3. Granting Plaintiff Leave to Amend Would Unduly Prejudice Defendants

"A litigant may be 'prejudiced' within the meaning of [Rule 15(a)(2)] if the new claim would: '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Pasternack* v. *Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)); *see also Agerbrink*, 155 F. Supp. 3d at 454 ("Although '[p]rejudice to the opposing party ... has been described as the most important reason for denying

a motion to amend,' … only *undue* prejudice warrants denial of leave to amend[.]" (quoting *Frenkel* v. *N.Y.C. Off-Track Betting Corp.*, 611 F. Supp. 2d 391, 394 (S.D.N.Y. 2009))).  "The non-moving party has the burden to show any prejudice of [a] proposed amendment." *Green* v. *Dist. Council 1707, Am. Fed'n of State, Cty., & Mun. Employees, AFL-CIO*, No. 13 Civ. 8671 (PAE), 2015 WL 4621107, at *1 (S.D.N.Y. Aug. 3, 2015).

"Often, as here, the concepts of undue delay and prejudice are interrelated." *Sly Magazine, LLC* v. *Weider Publications L.L.C.*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007).  Thus, evaluating Rule 15's three prejudice factors "requires an assessment of not only the amount of time that passed before the movant sought to amend, but also the reasons for that delay and its practical impact on the other side's legitimate interests, including both that party's ability to respond to new claims or defenses and any other prejudice flowing from a delay in the final adjudication of the case." *RCX I, LLC* v. *Pitter-Nelson*, No. 11 Civ. 3513 (CM), 2014 WL 5809514, at *6 (S.D.N.Y. Nov. 6, 2014) (quoting *JPMorgan Chase Bank, N.A.* v. *IDW Grp., LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 1357946, at *3 (S.D.N.Y. May 12, 2009)).  And "[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Hutter*, 41 F. Supp. 3d at 371 (quoting *Block*, 988 F.2d at 350)

Defendants have carried their burden of showing that granting Plaintiff's motion for leave to amend would unduly prejudice Defendants.  True, allowing Plaintiff to file the Fourth Amended Complaint would not require Defendants

"to expend significant additional resources to conduct discovery and prepare for trial." *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 350). But the principal reason that discovery has been stalled is that Plaintiff has deliberately adopted a "moving target" approach to his pleadings, necessitating additional motion practice.

There can be no question that granting Plaintiff's motion would "significantly delay the resolution of" this case. *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 350). Plaintiff's suit has become something of an ouroboros — an infinite loop of complaints and motions directed at them. "Defendants have been forced, over a nearly two year period, to prepare detailed pre-motion correspondence outlining [Plaintiff's] pleading deficiencies, and prepare numerous separate briefs." (Greene Br. 14; *see also* MPS Br. 13-14 ("An extraordinary amount of effort, including an[] extraordinary amount of activity accounting for over 114 docket entries, has gone into this case.")). Granting Plaintiff leave to file his ready-made-for-dispositive-motion Fourth Amended Complaint will only serve to delay further what has already been a long and hard-fought case.

It is true that "the prospect of continued litigation does not constitute prejudice for the purposes of Rule 15." *Pitter-Nelson*, 2014 WL 5809514, at *6. "Nor can complaints of 'the time, effort and money … expended in litigating [the] matter,' without more, constitute prejudice sufficient to warrant denial of leave to amend." *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 351). The distinction here is that Plaintiff offers no valid reason to explain the three-

year gap between the date he filed his first Complaint and the date he tendered his Fourth Amended Complaint. The Court recognizes the different state of affairs occasioned by Plaintiff's decision to obtain counsel; what it *cannot* understand is why Plaintiff waited two years, four complaints, and one dispositive motion to effect that retention and then file a proposed amended complaint that mimics his earlier, uncounseled pleadings.

Plaintiff concedes that granting him leave to amend will prejudice Defendants. (Pl. Reply 15). But he contends that because this case has not progressed to discovery, and because the Fourth Amended Complaint's "claims are not new," Defendants will not be *unduly* prejudiced if the Court allows Plaintiff to file his Fourth Amended Complaint. (*Id.* at 14-15). Lost in these arguments is the fact that all of the events giving rise to Plaintiff's claims occurred many years ago — long before December 31, 2014, when Plaintiff filed this action. It is not helpful to Plaintiff's arguments that four of the Fourth Amended Complaint's five counts appeared in previous versions of Plaintiff's complaint.

Why, then, should Plaintiff be afforded a *fifth* opportunity to assert claims he pursued, then abandoned, years ago? Things might stand differently if the Fourth Amended Complaint alleged new facts to render those claims cognizable. But it does not. Instead, the Fourth Amended Complaint stands on essentially the same allegations Plaintiff has levied against Defendants since 2014 — albeit with fewer dates, and less context, than the four complaints that

preceded it.  Put simply, Plaintiff offers no explanation for why this Court should give him a fifth bite at the apple.

The Court also believes that allowing Plaintiff to file the Fourth Amended Complaint would "prevent [him] from bringing a timely action in another jurisdiction." *Pasternack*, 863 F.3d at 174 (internal quotation mark omitted) (quoting *Block*, 988 F.2d at 350).  Most of Plaintiff's claims sound in state law; allowing Plaintiff to file yet another complaint in this Court will impede him from pursuing those claims in state court.

In sum, Defendants will be unduly prejudiced if the Court grants Plaintiff's motion for leave to amend.

### 4. Plaintiff Has Unduly Delayed Moving for Leave to File the Fourth Amended Complaint

Finally, the Court considers Plaintiff's "'undue delay' … in deciding whether to grant [him] leave to amend under Rule 15(a)." *Krupski* v. *Costa Crociere S. p. A.*, 560 U.S. 538, 553 (2010) (quoting *Foman* v. *Davis*, 371 U.S. 178, 182 (1962)).  There is scant daylight between this final Rule 15(a) factor and the prejudice analysis the Court just performed.  *See Sly Magazine*, 241 F.R.D. at 532.  "When a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." *Park B. Smith, Inc.* v. *CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  "Simply alleging that the plaintiff could have moved to amend earlier than [ ]he did, however, is insufficient to demonstrate undue delay." *Agerbrink*, 155 F. Supp. 3d at 452.

Again, Plaintiff offers no "valid reason" for the two-year gap between his initial complaint and his Fourth Amended Complaint. Plaintiff attempts to justify this delay by focusing on his breach of contract claim: He contends that this "claim never really left the case," because his "initial and First Amended Complaint included a breach of contract claim." (Pl. Br. 6). But that justification fails in two ways. First, it confirms that Plaintiff knew about the facts giving rise to his breach of contract claim since late 2014, when he filed his initial Complaint. And second, it ignores the fact that the Fourth Amended Complaint resurrects three other claims that appeared in Plaintiff's first Complaint. Plaintiff, in other words, does not explain why he needed two years to reassert the same claims he brought when this case began. His delay in filing the Fourth Amended Complaint is undue.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for leave to amend is DENIED. The Clerk of Court is directed to terminate the motion appearing at Docket Entry 112.

The parties are ORDERED to file a proposed Civil Case Management Plan and Scheduling Order **on or before September 8, 2017.**

SO ORDERED.

Dated:     August 16, 2017
           New York, New York
                                    _____
                                       KATHERINE POLK FAILLA
                                       United States District Judge

36